**ADMIRAL FINANCIAL CORPORATION,**
Plaintiff,

v.

**The UNITED STATES of**
**America, Defendant.**

No. 93–489C.

United States Court of Federal Claims.

July 31, 2003.

Thomas J. Meeks, Miami, Fl, with whom were Alan G. Greer, Miami, Fl, and Lynn F.

Kaufmann, Washington, D.C., for Plaintiff, Admiral Financial Corporation.

Ariene Pianko Groner, with whom were F. Jefferson Hughes, Kenneth Dintzer, Daniel D. McClain, Patricia A. Smith, Jeanne E. Davidson, David M. Cohen, and David W. Ogden, Department of Justice, Washington, D.C., for Defendant.

## OPINION

BASKIR, Judge.

In a previous opinion of October 21, 2002, the Court ruled in summary judgment on the question of liability in this case. *See Admiral Fin. Corp. v. United States*, 54 Fed.Cl. 247 (2002). As other Courts have held in *Winstar*-related cases, we found that a valid, binding contract existed between the Government and Plaintiff, Admiral Financial Corporation. Specifically, we held that the Federal Savings and Loan Insurance Corporation (FSLIC) and its successor, the Federal Deposit Insurance Corporation (FDIC), were contractually bound to count supervisory goodwill resulting from Admiral's acquisition of the failing savings and loan institution, Old Haven, toward regulatory capital requirements. Furthermore, we found that the passage of the Financial institutions Reform, Recovery, and Enforcement Act (FIRREA), and the implementation of its regulations (including the barring of the use of intangible capital), constituted a breach of this contract.

We reserved for subsequent trial the Plaintiff's claim for damages and the Government's affirmative defense of a prior breach. Having heard the parties' evidence and argument, and considered their post-trial briefs, we conclude that by the time the Act was passed in August 1989—and most certainly by the effective date of the regulations in December—the thrift had failed, the investors had abandoned all hope of recovery with the existing resources and indeed of providing additional capital, and that operating control had passed from the owners to the FSLIC.

Consequently, we conclude that the Plaintiff had committed a prior material breach of the contract by not maintaining the thrift's capital, and in any event were not harmed by the breach occasioned by the enactment of FIRREA. They are thus not entitled to any recovery.

## BACKGROUND

A brief background of the liability history of this case is necessary in order to comprehend precisely why the Government's breach has been rendered inconsequential. The broad background of the events giving rise to these cases is discussed at length in *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). This Court has also had the opportunity to more fully address the substantive aspects of the *Winstar* litigation. *See Admiral*, 54 Fed.Cl. at 252–53; *see also S. Cal. Fed. Sav. & Loan Assoc. v. United States*, 52 Fed.Cl. 531 (2002). We merely hit some of the highlights below.

### I. The *Winstar* Context

In the 1980's, the FSLIC provided certain incentives to encourage private investors to purchase struggling savings and loan institutions, or "thrifts." This policy represented an attempt by the Government to avoid liquidating struggling thrifts and thereby being forced to use FSLIC funds to reimburse depositors. Outside of direct cash assistance, the FSLIC's primary inducement to potential thrift purchasers was a partial forbearance from regulatory capital requirements. It accomplished this by allowing the thrift purchaser to treat the thrift's asset shortfall as an asset for limited purposes. In other words, the difference between the thrift's assets and liabilities was "transformed" under FSLIC regulations into an asset in an amount equal to that difference, called "supervisory goodwill."

The FSLIC, or more particularly its enforcement arm in the Federal Home Loan Bank Board (FHLBB or Bank Board), then permitted this "supervisory goodwill" to be included among the assets that the purchaser could use to meet regulatory capital levels required by FSLIC regulations. Supervisory goodwill was to be amortized over a long period of time, thereby allowing the thrift's purchaser to contribute far less in actual capital to the thrift. As a practical matter,

these policies made the thrifts far more attractive as investments to potential purchasers, without any additional cost to the FSLIC. *See generally Cal. Fed. Bank v. United States,* 245 F.3d 1342, 1345 (Fed.Cir. 2001).

The regulatory polices undertaken by the FSLIC proved both controversial and unsuccessful in resolving the thrift crisis, and on August 9, 1989, Congress enacted FIRREA. Among other things, FIRREA phased out the inclusion of "supervisory goodwill" in the calculation of regulatory capital and imposed upon thrifts additional capital requirements—a change that proved particularly problematic for purchasers of thrifts who had used the fictional asset of "supervisory goodwill" to meet their regulatory capital requirements set by the FSLIC and enforced through regulatory capital maintenance agreements (RCMA) signed with the Government as part of the earlier acquisitions.

The Act also changed the structure of the Government's regulation of the thrift industry. Under FIRREA, the FSLIC was abolished and a new thrift deposit insurance fund under the management of the FDIC was created. At the same time, FIRREA replaced the Bank Board with the Office of Thrift Supervision (OTS), an office within the Treasury Department responsible for the regulation of all federally insured savings associations. FIRREA also created the Resolution Trust Corporation (RTC) to manage and liquidate or otherwise dispose of failed thrifts.

On November 8, 1989, the OTS issued regulations implementing FIRREA's capital requirements, along with a bulletin that stated that the statute eliminates the capital and accounting forbearances previously granted to thrifts. The regulations became effective on December 7. As a consequence, many thrifts fell out of capital compliance, making them subject to immediate seizure by thrift regulators.

The litigation that ensued in this Court was governed by a carefully considered case management process. *See Admiral,* 54 Fed. Cl. at 252–53. The test cases made their way through the appellate processes and resulted in a plurality decision in *United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Relying on the Supreme Court's decision and several other precedents following that decision, we held in this case that the Government's sweeping regulatory changes resulted in a breach of the contract with Admiral. *Admiral,* 54 Fed.Cl. at 258–59.

## II. The Contract

By the late 1980s, Old Haven Federal Savings & Loan Association (Old Haven) was one of many failing "thrifts" made available for merger by the FSLIC/FHLBB pursuant to its general policy of encouraging stronger banks to merge with weaker banks. The Plaintiff, Admiral Financial Corporation, was created solely for purposes of this transaction. It consisted of a group of investors with little or no prior banking experience headed by Lee Popham, who was to become Executive Vice President and Chief Financial Officer of Haven. Admiral acquired Old Haven through its subsidiary, Admiral Federal Savings and Loan Association, which was also created for the sole purpose of merging with the thrift. The acquisition was approved by the Government and was undertaken by Admiral with the benefit of the following regulatory incentives.

First, Admiral sought confirmation from the Bank Board that, for purposes of regulatory capital compliance, the balance of assets and liabilities of the merged institutions would be accounted for by "supervisory goodwill." Also, Admiral would be entitled to account for the negative net worth of the thrift under the purchase method of accounting. Admiral desired to amortize any resulting goodwill on a straight line basis over a 25-year period.

Collectively, these forbearances insured that the merger would not reflect unfavorably on the new thrift's capital. In fact, in this case we noted that without these forbearances, the new thrift would have suffered a fatal shortfall of capital, and would have been out of compliance with regulatory capital requirements immediately after the merger. *Admiral,* 54 Fed.Cl. at 257.

Admiral and Old Haven entered into a formal merger agreement on August 6, 1987,

resulting in the formation of a new institution named Haven Federal Savings and Loan Association (Haven). Admiral contributed over $11 million net equity in order to bring the failing thrift into compliance with the FHLBB's minimum capital requirements. The merger was fairly standard among *Winstar* transactions, with the exception that the assets Admiral contributed to the resulting institution—and those that were to be counted as regulatory capital for the institution—included nonliquid assets such as parcels of real estate and an unproven business in the sale and service of Tax Sale Certificates (TSC). Admiral contributed a modest amount of liquid assets. Appraised values were used to record these assets toward Haven's regulatory capital. The real estate values were set at approximately $7.6 million by agreement between the investors and the Bank Board, apparently with little if any dispute at that time. There was also no dispute over the recorded value of the TSC business at $4.1 million. At trial, however, these values were subject to strenuous disagreement. We describe the valuation controversy shortly.

The acquisition was formally approved April 26, 1988, with the issuance of FHLBB Resolution 88–305 (the Resolution). This Resolution incorporated Admiral's business plan. It also included a schedule for liquidating Admiral's contributed real estate assets, which made up the bulk of Admiral's capital contributions. The Resolution also discussed the FHLBB's utilization of "supervisory goodwill" and a corresponding capital maintenance commitment by Admiral, as documented in the Regulatory Capital Maintenance Agreement (RCMA). The RCMA, as did other such agreements in *Winstar* transactions, obligated the investors to make up shortfalls in capital according to a complex timing formula. The RCMA was signed by the acquirors—Admiral, Caesar Creek Holdings, Inc. and Caesar Creek TSC, Ltd.—and the FSLIC. Each of these items set forth conditions, obligations, and remedies and together constituted the over-arching contract we found in our earlier decision.

Critical to Admiral's ability to maintain the minimum capital level required by the Bank Board, of course, was the favorable regulatory treatment bargained for by Admiral which, in this case, resulted in the recording of $8.98 million of goodwill on the books of the newly formed Haven.

Because the contributed assets were made up largely of Admiral's real estate holdings, the Government insisted that those properties be liquidated on a timely basis so their capital value could be realized and be used to fund the thrift. Admiral was soon confronted with two very sharp horns of a dilemma; sell the real estate at a loss and face a capital shortfall; or hold onto the properties, maintaining the appraised value for regulatory capital requirements, but risk running up against the deadlines for liquidating the contributed assets. Walking this tight-rope proved too challenging for Admiral. It soon found its investment in a downward spiral in 1989, a period which also saw the passage of FIRREA in August, and which ended in the Fall with the formal seizure of the failed Haven.

## III. Dispute on "Value" of Contributed Assets

The trial commenced with a vigorous debate over the value of the assets contributed by Plaintiff. This dispute occupied a considerable amount of time, far more than at the time of the acquisition, and perhaps far more than its relevance to the issue of damages. Ultimately, we do not have to make specific findings as to the value of the assets for damage purposes, since we find that Plaintiff is not entitled to any damages. However, the evidence respecting value does prove helpful in understanding why Admiral found itself in the nigh-inevitable position of triggering the RCMA.

### A. Real Estate Valuation

Approximately $7.6 million of the contributed assets consisted of 27 parcels of land in southern Florida owned by the Admiral investors. Admiral had identified a series of parcels as the negotiations proceeded, some of which fell out of the list and were replaced by others. Leading up to the approval of the acquisition, Admiral placed a value on each of the properties. These values were the result

of appraisals done by the individual owners which were submitted to the FSLIC for review by a Bank Board designated District Appraiser. The review resulted in requests for more supporting documentation on some parcels, and outright reductions of value on others. Eventually, a value for each parcel was established either by direction of the District Appraiser or by his acquiescence in the proffered figure.

The District Appraiser's review was not a true appraisal of market value, argues the Government, but rather a confirmation that the property could be recorded at that value strictly for purposes of determining the regulatory capital at the time of merger. Apparently, in the interests of efficiency, the FHLBB only had the District Appraiser review 10 of the real estate appraisals submitted by Admiral, and even those reviews were cursory at best. In short, the District Appraiser reviews were more or less a "spot check" to gauge the accuracy of the Admiral's representations as to the equity in its contributed properties.

During trial, the Government's efforts were focused on undermining the values placed on the parcels by the Plaintiff, the reliability of the review, and the revised values directed at the time by the Government. In point of fact, the FSLIC clearly assumed the authority to determine the valuation to be placed on the contributed assets. That it did a poor job, subject to hindsight criticism 15 years later, makes the Government exercise an extreme example of "Monday morning quarterbacking."

The unassailable fact is that both parties had incentives to reach a reasonable and realistic valuation—the FSLIC because it was administering the banking laws in the public interest and had no incentive to overvalue the assets; and the Plaintiff, who also had an incentive to reach a realistic value since "high-balling" would put the new bank in difficult straits when the overvalued property was sold.

The parties also contended over whether the ultimate values represented Fair Market Value. Although the Government made much of the fact that this was not a "sale," it still remains that the parties, operating at arms length, were required to reach agreement on a valuation as part of a business transaction important to both. Sale or not, a value was fixed by arms-length negotiations of two parties, and title passed from Admiral or its investors to Haven in return for stock in Haven. Whether these values were technically Fair Market Value is a quibble.

Disputes about valuation aside, the evidence makes it quite clear that the entire business operation rested on the Plaintiff's ability to convert the real estate into cash at something near the assigned values or better. The contract set forth definite time lines for this conversion, and the success of the bank was conditioned—but not guaranteed—on the Plaintiff's ability to effect this. Considering the healthy real estate market at the time of the negotiations, this was a bet that the market would be just as strong when the time came to sell. It was, in short, an investment—one is tempted to say, a speculation—on the state of the southern Florida real estate market over the 2–year period in which these new assets of Haven's would be sold. In this respect, the risk was all on the Plaintiff. A bad outcome meant only that the FSLIC would get back a bank that had failed again, and they would be little the worse for the poor outcome. For the Plaintiff, of course, it meant, at the minimum, loss of the real estate and their other investments.

### B. Tax Sale Certificate Business

The Plaintiff's other major contribution was the TSC business ostensibly owned by the venture capital firm Caesar Creek Holdings (CCH), another Lee Popham entity. This valuation also provoked much dispute at trial. If the real estate valuation process involved coming to agreement on the value of an asset that concededly had some level of value, the TSC business was a valuation of a non-existent business as though it were actually operating and at a profit. The proposed business was to create a secondary market in the TSCs, securities issued by Florida counties based on delinquent real estate taxes. For some time, Mr. Popham had been investing in the certificates themselves and some were contributed as part of the acquisition.

Indeed, the thrift was seen as a mechanism to expand this operation. Mr. Popham proposed to bundle packages of $10 million each and sell them, offering at the same time to service the certificates.

The proposed enterprise was assigned a value of $4.1 million for purposes of determining how much regulatory capital that contribution represented. The accounting firm of Peat Marwick, now known as KPMG, was commissioned to review the assets contributed in the acquisition; more precisely, the method by which the value was determined. To this end, Peat Marwick submitted an "agreed-upon procedures" letter endorsing the methodology used.

But testimony by accounting expert, David Kennedy, made clear the distinction between what Peat Marwick was endorsing, and what it was not endorsing. Peat Marwick was not endorsing the values to which this methodology was applied. Put another way, Peat Marwick approved the formula and analysis but did not comment on the values assigned to each factor in the formula or the legitimacy of the final result.

To the Court's surprise, the firm actually endorsed these speculative values or at least appeared to do so. Perhaps the TSC business looked more impressive on paper than it did when described for us at trial. There is no sign that the Peat Marwick report recognized that the "asset" they were valuing—or more accurately, confirming the valuation method used by the Plaintiff—wasn't really operating as a business, and never had (and never would). We, therefore, do not assume that the FSLIC, which accepted the Peat Marwick-endorsed valuation, knew the business did not exist.

In the end, the matter of the TSC valuation has all the earmarks of a "smoke and mirrors" proposition, which raises questions about the business acumen—If not more serious questions—of the Plaintiff and the FSLIC officials. Indeed, there was also evidence to support the conclusion that the TSC business was not an asset supporting the operation of a reformed bank. Rather, the reformed bank was created to support the operation of the TSC venture. Banks that financed CCH TSC investments suggested

that instead of seeking financing for the TSC business from existing banks, Mr. Popham should own his own bank, and thereby finance the operation that way.

The TSC business was a chimera. Like Oakland, California, there was "no there there." To the extent that the soundness of the new thrift's operations depended on this contributed asset as a going business, supporting with its capital value Plaintiff's banking operations, this it could never do. There was no basis for $4.1 million of Haven's capital. It was "pie in the sky" from the beginning.

## IV. The Government's Breach

We found as a matter of law that the Government breached the contract. When the goodwill provisions that provided Admiral's consideration for the contract were phased out the Government took away the key benefit in Admiral's acquisition of Old Haven.

Most of the Government's efforts in the *Winstar* litigation, at least at the summary judgment stage, have focused on negating the elements of a contract. This case was no different. Defendant vigorously attempted to distinguish this case from those cases that found a binding contract in similar transactions. Interestingly, in this case very little attention has been directed to the precise timing of the breach. There is no question that the forbearances here were contractual commitments as opposed to regulatory policy. Similarly, there is no question that the provisions of FIRREA breached that contract. But when? Enactment? Implementing Regulations?

The Supreme Court and the Court of Appeals for the Federal Circuit speak in very general terms about the breach, never decisively pinpointing the breaching event as the passage of FIRREA, or it's subsequent implementation via the FDIC regulations. Under the Omnibus Management Plan, Judge Wiese was assigned the responsibility of determining when the cause of action accrued for statute of limitations purposes. This he found to be December 7, 1989, the effective date of the FIRREA regulations, unless an

earlier date could be proved in particular cases. *See Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174 (1997). This holding has not been endorsed by the Federal Circuit as of this writing. *See, e.g., Ariadne Fin. Servs., Ltd. v. United States,* 133 F.3d 874, 880 (Fed.Cir.1998) (Court declined to determine whether cause of action accrued on FIRREA's enactment, on the effective date of regulations, or some other date).

The question is implicated in the present case. The Defendant has argued as an affirmative defense to its breach Plaintiff's prior material breach. Whether Defendant is liable, therefore, turns on a series of events, which we address below. Since the critical events in this case occur throughout calendar year 1989, during which the Act and then the regulations occurred, pinpointing the effective date of the Government's breach could be crucial. However, in the course of this case we have treated the critical date as the enactment, August 9, 1989, and the Government "agrees." We thus look to events before this date to determine whether there was a prior breach.

## V. Plaintiff's Damage Claims

The Plaintiff seeks two types of restitution damages: A benefit-conferred theory based on the time benefit, or liquidation cost savings, to the FSLIC in the amount of $3,323,000, and money-back, or capital contributed, in the amount of $11,072,075, a figure that includes the value of the contributed assets and associated expenses.

Admiral's "time benefit/liquidation cost savings" theory has been rejected by the Court of Appeals, which held that restitution could not be measured in terms of a "liability that never came to pass, and based on a speculative assessment of what might have been....". *Glendale Fed. Bank v. United States,* 239 F.3d 1374, 1382 (Fed.Cir.2001). Were our decision on liability to be different, we still would not award the Plaintiff's request for restitution damages based upon this theory.

As to the request for money-back restitution, while courts in *Winstar*-related cases have typically awarded damages on this theory, here it is not appropriate due to our finding on prior breach and lack of harm.

The third area of damages is the Plaintiff's request for $644,670 in reliance damages, or, in other words, for costs necessary to complete the merger transaction. "The reliance recovery is a reimbursement for losses the plaintiff suffers in reliance on the defendant's contractual promise." 3 DAN B. DOBBS, LAW OF REMEDIES § 12.3(1) (2d ed.1993). As a general matter, reliance damages are available for costs incurred both before and after the breach. But our finding precludes recovery on this theory as well.

## VI. The Prior Breach Defense

As we stated in our prior Opinion, a number of factors combined to make it advisable to consider the Government's prior breach contentions along with the trial on damages. *Admiral,* 54 Fed.Cl. at 259.

The Government eventually argued two alternative breaches on the part of Admiral: (1) the failure to recapitalize Haven upon falling below regulatory capital requirements; or (2) the failure to sell contributed real estate assets in accordance with the agreed upon liquidation schedule. As we shall detail shortly, the Plaintiff did in fact abide by the sales schedule, at least during the critical first-half of 1989. The recapitalization issue is quite another matter. As we have already indicated, and will detail below, the Plaintiff was in material breach of the RCMA before August 9, 1989.

Admiral counters the Government's breach arguments with an array of related avoidance arguments, primarily targeting the regulatory supervision of the new thrift, completely independent of the controversies surrounding the treatment of supervisory goodwill: Admiral's removal from effective control of Haven; the frustration of Admiral's business plan for Haven; and the Governmental approval process for the sale of real estate contributing to the inability to meet the liquidation schedule. Except for the last of these arguments, which we address immediately below, the avoidance theories are without merit.

*FINDINGS OF FACT AND*
*CONCLUSIONS OF*
*LAW*

## I. The Sale of Real Estate

█ As we have held, the contract in this case includes a collection of documents evidencing the bargained for elements of the merger transaction. *Admiral,* 54 Fed.Cl. at 256. The acquisition approval, Resolution 88–305, as well as the RCMA, are two such documents. *Id.* The Government's consideration for this agreement was the economic vitality of the failing thrifts. To this end, the Government was entitled to ensure the security of Haven, a measure of which is its operating capital. The FSLIC accomplished this through Condition 15 of the Resolution and Article II(C)(1) of the RCMA. Those provisions set out Admiral's duty to cause Haven to sell the real estate contributed by Admiral on a schedule. Haven was to dispose of 37.5 percent by March 31, 1989, and then liquidate no less than 12.5 percent each succeeding quarter, selling all the property by June 1990.

We do not view this bargained for element of the contract lightly. As the testimony revealed, neither did the parties— Admiral initially fought for a 5–year schedule, yet the Government insisted on a maximum 2–year window for liquidating these assets. The supervisory agent for · this transaction stated early on: "[I]f the real estate liquidation does not proceed in accordance with the schedule required by the Bank Board, we fully intend to exercise the authority provided in the regulatory capital maintenance dividend limitation agreement, including removing Mr. Popham and other Admiral personnel from the board and management of Haven and selling Haven's stock to outside investors." Tr. 1001–02.

The goal, after all, was to create in Haven a stable financial institution. Real estate holdings, at least during that period, were not the most secure form of investment. We conclude that the failure to meet the liquidation schedule would indeed amount to a material breach of this contract. As such, the Government would have been excused in rendering its performance. In fact, the contract expressly permitted the FSLIC to take over Haven, resulting in the forfeiture of Admiral's entire investment, if the sales schedules were not met. RCMA § V(C). However, as we said, there was no prior breach in this regard.

In the disposition of the Westview property, one of the earlier parcels Haven attempted to liquidate, we are shown why assigned property values became so contentious. According to Ronald Hendricks, the Government's expert on real estate valuation, the appraisals for this particular property, a low-income apartment complex, assumed rental income well above what had been generated in the past. The projected "market value" of the property was $11 million. The sale price of the property was just under $9.3 million. On March 28, 1989, Admiral purported to sell the property for $100,000 equity and the assumption of the property's debt. Tr. 182 (Popham). This resulted in a loss of approximately $3.2 million in Haven's regulatory capital. As we shall see, this loss, together with operating losses, had a decisive impact on capital. The Westview sale resulted in Haven's failure to meet the minimum regulatory capital requirement by almost $600,000.

When the first liquidation deadline arrived on March 31, 1989, Admiral had just barely met its quota of real estate sales, primarily because of the sale of the Westview. Apartments, which represented approximately 40 percent of the total value of contributed assets. As it later turned out, by the fall of 1989, the Westview transaction unraveled. For this reason, Defendant argued that Admiral's previous representation to the Bank Board that the Westview properties had been sold was false. Because the sale fell through, reasoned the Government, Admiral was retroactively in breach of the RCMA and could have forfeited its entire investment for failing to meet the schedule.

In March 1989, Haven entered into a purchase and sale agreement with respect to the apartments which was expressly conditioned on approval by the United States Department of Housing and Urban Development. Tr. 182. The property closed in March in escrow pending this approval, which was considered only a formality. Haven's manage-

ment responsibilities over the property were relinquished at that point. At the time all parties considered Westview "sold" for purposes of the schedule, and the results were posted to Haven's books.

The evidence clearly established that there was nothing more Haven or Admiral could have done to further the sale of the property. When it became evident six months later that HUD approval was not forthcoming—apparently, an inspection revealed fire code violations—the sale collapsed. As of that date there was a breach of the sales schedule obligation. But we do not regard it appropriate to "relate back" this failure to March 31. We, therefore, reject the Government's affirmative defense of prior material breach in the alleged failure to meet the contract's real estate liquidation schedule.

## II. The Failure To Maintain Regulatory Capital

### A. The RCMA

■ The Resolution approving the acquisition of Old Haven required Plaintiff to enter into an:

> [a]greement stating that, as long as it controlled Haven it would maintain Haven's regulatory capital at a level equal to that reflected by 12 C.F.R. § 563.13(b), as now or hereafter in effect, and, as necessary, will infuse additional equity capital, in a form satisfactory to the Principal Supervisory Agent, to effect compliance with such requirement during the first quarter after which Haven fails to meet its regulatory capital requirement.

Resolution, Condition 6. The parties did so by executing the RCMA. Section II(A) of the RCMA incorporated this commitment.

Pursuant to Section II(A), the Plaintiff was required to make up any regulatory capital shortfall by the end of the quarter following the quarter the thrift fell out of compliance. If it failed to do so, Plaintiff would be in default at that time. The Government's formal notice of default then triggers a 90–day period within which Plaintiff may cure the default.

### B. The Downfall of Haven

Haven began experiencing losses immediately after the June 1988 merger. A business plan Admiral submitted as part of the transaction proved as overly optimistic as the property appraisals. The contributed properties carried large operating losses. In its first two quarters, Haven lost approximately $500,000 in each quarter, despite business plan projected gains of $55,000 and $100,000, respectively. Tr. 1744–46 (Kennedy).

Only four days after the merger was approved, Admiral sent the FHLBB–Atlanta a proposal to acquire Brickelbanc. Mr. Teed, the Supervisory Agent assigned to the Admiral–Old Haven merger, rejected the request. He felt it was far too early to take such a step. Mr. Teed instructed Admiral that it needed to sell the contributed properties and focus on making Haven a viable institution before proposing other acquisitions. In trial, the Government expert, Professor Barry, concurred with Mr. Teed's decision; it would not have been prudent for the Government to have allowed Admiral to acquire Brickelbanc at that time. Further, Professor Barry concluded that Mr. Teed's blocking of the Brickelbanc acquisition did not prevent Haven from following its business plan because the financial projections in the business plan did not anticipate any acquisitions. In fact, the acquisition of Brickelbanc would have forced the Government to provide funds (unanticipated in the original business plan) to capitalize Brickelbanc by buying Haven stock.

Other investment strategies were also curtailed by Mr. Teed. Rather than using CDs to fund growth, Admiral attempted to use Government National Mortgage Association securities (GNMAs) to acquire additional GNMAs, thereby leveraging Haven's GNMA position, and using the income from that GNMA portfolio as an offset to daily operating expenses. The Supervisory Agent viewed this practice—purchasing securities without an ability to fund the purchase when due—as a strategy that was both unsafe and unsound. Jeremy Blum, the bank examiner who initially reviewed this merger in December 1988, testified that funding the long-term investment in GNMAs with short-term liabilities, poses a substantial risk that interest

rates may exceed the yield on the GNMAs. Tr. 1074–75. Consequently, in March, 1989, Mr. Teed authorized Haven to sell $18 million in Freddie Mac mortgage-backed securities and to use the money to pay off the short-term borrowings that were used to buy GNMA certificates. This action resulted in a decrease of total liabilities by $18 million.

In December 1988, Haven's President wrote a letter to Mr. Teed requesting permission to transfer liabilities to its subsidiary, Ridge Mortgage and Service Corporation for the purpose of reducing Haven's regulatory capital requirement. Mr. Teed, however, advised Haven not to undertake the transaction. Such an action would have had an adverse effect upon Haven's safety and soundness because Haven would still have had the same risks, but would not have been required to maintain capital to support them.

Although it did not seek to reverse Mr. Teed's negative responses at the time, Admiral has now cited each of the above in answering the Government's prior breach allegation. Plaintiff would have this Court find that Mr. Teed's actions prevented the Plaintiffs from making Haven thrive as an institution, thereby causing it to violate the RCMA. We disagree. Each of these instances reflect the legitimate exercise of regulatory authority by the agent tasked with overseeing the early post-merger activities of the thrift.

In fact, Mr. Teed was obligated to reject the proposals to acquire other Institutions at this stage in Haven's development because of the thrift's poor MACRO rating. Haven's "MACRO rating," a measure of a lending institution's financial stability, was a 4 on a scale of 1–5. A 4–rating indicates that an institution has significant problems or is in an unsafe or unsound condition. It also means that growth must be limited until the unsafe and unsound conditions are remedied. According to Mr. Blum, Haven probably deserved a 5, the worst rating. It was only because he deferred to his supervisor who wanted to give the brand new management of Haven the benefit of the doubt, that he ultimately signed on to the 4–rating. Tr. 1066–96.

In February of 1989, Admiral revised its projections in light of its recent experience. Regulatory capital had been projected at $21 million, but was already at $12 million according to Mr. Popham. Even at this early stage of the contractual relationship, Plaintiff projected quarterly losses for the next three years and a regulatory capital deficiency—including goodwill—of $3.5 million. These projections did not even consider inevitable losses resulting from the sale of real estate at lower values than the appraisals. Tr. 457. Repeatedly, bank examinations uncovered the flaws built into Admiral's business plan; it was considered overly optimistic in light of the fact that the troubled thrift would not be permitted to grow at the pace suggested by Admiral. Tr. 1079–81. Concerned by Haven's operating losses and its exposure to fluctuating interest rates, Mr. Teed advised Admiral to accelerate the liquidation of the contributed real estate in order to avoid additional losses. Tr. 878.

Although the Westview transaction is not a breach in and of itself, it had dire consequences. The optimistic real estate valuation that seemed in April, 1988 to be a great boon to the investors, was by March 1989 revealed to be a fatal miscalculation. Soon after the merger transaction Admiral found that the market value of the properties had dropped significantly. When the initial sale threshold arrived in March 1989, Haven was forced to sell the Westview parcel at a tremendous loss. Tr. at 182. The proceeds fell far short of the appraised value that had been previously accepted by the FHLBB in calculating the new institution's regulatory capital. As a result, Haven fell out of regulatory capital compliance by the end of the quarter on March 31, 1989. Haven's regulatory capital was only $12 million, $9 million under the business plan's projections and $580,000 under minimum requirements.

The shortfall in regulatory capital as of March 31 triggered a series of obligations. Pursuant to the RCMA, Admiral had to bring the thrift back within regulatory capital compliance by the end of the next quarter, June 30, or it would be in default of its contractual obligations. Under the terms of the RCMA, however, Admiral had 90 additional days in which to cure this default or be subject to RCMA remedies including forfei-

ture of stock. To do so it had to infuse enough additional capital to bring Haven into regulatory capital compliance.

This "cure period" should have commenced upon default, or at least formal notice of default. As we learned from the evidence, however, a notice of default was initially issued on April 28, 1989, rather than at the end of the next quarter, when Admiral would actually be in default. At the time the Plaintiff pointed out that the default notice was premature. The notice was withdrawn, and the formal notice of default did not get sent out again until July 17, 1989. That triggered a cure period which either started after June 30, or July 17. Under either scenario, the period extended beyond the date that FIRREA was passed.

The bank examiners stepped up their enforcement activity with the demonstrated instability of Haven. As of March 31, Haven's MACRO rating, a measure of the extent to which the institution is run in a "safe and sound" manner, was a 4. We recall it had previously received a MACRO of 4 in December. As a regulatory consequence of this poor rating Haven's growth was restricted. FHLBB Policy Statement on Growth for Insured Institutions, Office of Regulatory Activities, "Regulatory Bulletin" (September 7, 1988); Tr. 476 (Burnette); Tr. 1066–67 (Blum). From a practical standpoint, this posed but another obstacle in attracting investors to rejuvenate Haven. In an early April report of examination, Mr. Teed found that Admiral was not operating the thrift in accordance with the approved business plan. Letter from Mr. Teed to the Admiral Board of Directors (April 11, 1989).

On April 27 Mr. Teed, the FSLIC Supervisory Agent, met with Lee Popham and other Haven principals. Ostensibly set to discuss the December, 1988 "4–rating," by this time conditions had gotten far worse. As reflected in a subsequent Teed memorandum to his associate, Walter B. Mason, Jr., Mr. Teed read the bankers the Riot Act:

I then began to focus on the significant problems of the institution by discussing our primary concerns with Haven: the lack of tangible capital and the capital deficiency. I informed the board that Ad-

miral must live up to its pre-nuptial agreement and maintain Haven's capital at required levels, and we emphasized that there is little leeway granted for capital deficient institutions such as Haven. *If Admiral does not live up to the capital maintenance provisions ... I stated that we would use all administrative and judicial powers available including severing all ties between Haven and Admiral, removal of all Admiral personnel from Haven,* taking control of Haven's stock, and possibly recommending an FDIC (sic) conservatorship.

FHLBB Memorandum from Mr. Teed to Mr. Walter Mason (May 16, 1989)(emphasis added).

Mr. Teed also emphasized the need to convert the real estate into tangible equity, "based upon the fact that after 40 percent of the properties have been liquidated based upon market value, only 6 percent of the projected equity has been realized." *Id.* Although at the time the deficiency was little more than $0.5 million, he determined that Haven required a capital infusion of at least $5 million in cash. That estimate was to grow quickly.

Mr. Teed returned to the capital deficit a number of times during the meeting. He made clear that the shortfall would have to be made up of further contributions from Admiral, perhaps by going into the capital market. While Mr. Teed agreed that the issuance of Admiral stock may be an acceptable solution to raising capital, he also made clear that a "merger does not appear viable at this time." *Id.*

In the face of the regulator's assessment, and in apparent complete disregard of his clear message, the memorandum goes on to state that Mr. Popham immediately volunteered "that Haven is actively seeking an acquirer or merger partner as possibilities to meet the capital requirements. He stated that *Admiral does not have the financial wherewithal to capitalize Haven." Id.* (emphasis added). This statement of Mr. Popham was especially significant given Mr. Teed's warning and the timing of this meeting. The very next day after the meeting, on

April 28, Mr. Teed sent out a formal notice of default of the RCMA. In his response, dated May 19, Mr. Popham informed Mr. Teed that Haven's board had appointed a recapitalization committee to pursue outside sources of capital in order to remedy the capital deficit.

We pause in our description of events to make a number of observations. First, Mr. Teed's emphasis on the RCMA and Admiral's obligations could not have been stronger. His memorandum reflects that he raised the subject at least three times. Second, he made clear that the capital obligation was Admiral's and that the RCMA required capital from that source. Third, he made clear that Admiral's failure to supply capital would mean the end of its relationship with Haven. In other words, the termination of the April, 1988 agreement with the Government.

Mr. Popham's response is equally significant. By stressing merger as the only possible solution, he acknowledged what everyone knew—the Admiral investors had no ready access to capital and no intention of trying to raise any. Recall the funding of the acquisition itself which included only a modest amount of liquid assets. A merger would in all probability also mean the end of Admiral's investment, and with that, the end of the 1988 agreement.

Mr. Teed's April 27 meeting was a "wake-up call." Mr. Teed was telling the parties to this contract that their investment was in jeopardy. We find that all parties, and certainly Mr. Popham, understood the import of Mr. Teed's warnings. Mr. Popham certainly understood this; one of Mr. Teed's memoranda references a subsequent meeting on May 9, and attributes to Mr. Popham a concern that the FHLBB might sever the relationship between Admiral and Haven. Memorandum from Mr. Teed to Ms. Richmond (May 25, 1989). These points are repeated in the weeks and months heading up to August as Haven's condition worsened.

As a follow-up to the April meeting, Haven was to submit a response to Mr. Teed's concerns and a corrective action plan. The Haven directors met and purported to "explore all possible solutions." Corrective Action Plan for Haven Federal Savings & Loan Association (Oct. 31, 1989). Although the report included a laundry list of "revamped" business functions, ultimately the board determined that Haven's capital deficiency would "most likely require Government assistance and a capital infusion." *Id.* The Corrective Action Plan identified four mandatory steps in returning the thrift to profitability. None of these steps called for capital infusion by Admiral.

On May 22, Mr. Popham submitted Haven's revised business plan. In a cover letter forwarding the report, Mr. Popham recognized that the sale of real estate will not help their regulatory capital compliance problem. He repeated what he had said in the April meeting—Admiral would not and could not supply the needed capital:

> [I]t is obvious that the significant changes in the interest rate environment have not only created a dramatic adverse effect upon our anticipated operations, but also our ability to sell the contributed property at values that were based upon a lower interest and mortgage rate environment. It is also apparent to us that we will have no alternative but to raise additional capital or be merged in the near future... As you know, *Admiral Financial Corp.'s only asset is (and has been) its investment in Haven Federal, and any additional capital will necessarily be supplied from other sources.*

Letter of Mr. Popham to Mr. Teed (May 22, 1989)(emphasis added).

This position was echoed in contemporaneous records contained in Admiral's annual report. In the cover letter forwarding the report to Admiral's shareholders, Mr. Popham indicates:

> Since Admiral has virtually no assets except the investment in Haven, we are unable to fund the investment necessary to bring Haven in regulatory compliance. Admiral is, therefore, in default of the net worth maintenance agreement and it is likely that Haven's current financial condition will cause the regulatory authorities to appoint a conservator for Haven.

Letter forwarding Admiral Financial Corp. Report for 1989 (November 22, 1989); Tr. 560 (Popham).

In May 1989, Haven's solution was to obtain additional capital through a public offering of its stock or that of Admiral, or by merging with another financial institution. Tr. 881; Letter of Haven's Board of Directors to Mr. Teed (May 3, 1989). Mr. Popham, himself, acknowledged that this last option meant the end to Admiral's investment. Tr. 272–73 (Popham). At no point in this trial did Plaintiff point to one document or representation by Admiral that it would avoid this result by supplying cash. Despite warnings by the FSLIC that it would pursue all available remedies under the RCMA, Admiral never infused additional capital into Haven or suggested that it would.

Haven's regulatory capital continued to decline as a result of the thrift's operating losses. By June Haven had liquidated fifty percent of the contributed real estate. But it suffered losses of $4.3 million in connection with carrying and selling this real estate at prices far below the recorded amounts.

When June 30 arrived, Haven's capital was now more than $2.3 million shy of the minimum levels—Ninety days having elapsed since the notice of the March capital deficit Admiral was now in default. For some unexplained reason, Mr. Teed waited until July 17 to send out the formal notice of default. But by then, the Plaintiff's investment was languishing.

Given the fact that the real estate holdings were overvalued—whether because of inflated appraisals or the declining market—Admiral could not expect to make up Haven's capital shortfall by liquidating more of the contributed assets. It resorted to its only remaining, albeit hopeless, option: outside investment in the bank. Admiral claimed it had discussions with several potential acquirers, including Viacom, and had been looking for months at merging multiple Florida savings and loan associations in order to make a stronger, statewide institution. Tr. 274 (Popham direct). At trial, Mr. Popham pointed to his efforts in seeking out investors both prior to and during the cure period. The correspondence received into evidence supports his claim. Tr.269 (Popham direct); see e.g., Letter of Mr. Popham to IBJ Schroder Bank & Trust Company (May 8, 1989); See, Internal FHLBB "Memorandum of Oral Communication" between Chip Caldwell and Ray Sabatella, President, Bayside FS & LA (July 11, 1989); Letter of Mr. Sabatella, President, Bayside Federal, to Mr. Popham (August 2, 1989).

The terms and inducements—as well as Haven's dire position—were illustrated by these letters. Mr. Popham offered up Admiral's stock in exchange for $10 million in additional Haven capital, the amount Mr. Popham estimated would be necessary to cover existing and anticipated capital shortfall. Letter from Mr. Popham to Mr. Winter regarding Admiral's Proposal and Prospects (May 8, 1989). Admiral was proposing to phase itself out of this venture with the FHLBB and Haven. See, Internal FHLBB "Memorandum of Oral Communication" between Chip Caldwell and Ray Sabatella, President, Bayside FS & LA (July 11, 1989) (in discussing potential acquisition by Bayside, Mr. Sabatella represented "Popham realizes he would be out of the picture, and he would walk away with Admiral and its real estate for minor severance cash (perhaps six months' salary.))" These overtures to potential acquirers were futile. Each was rejected. No bank would merge with Haven with its capital deficit, especially considering that the goodwill recorded for the initial transaction would have to be written off. Tr. 1781–82 (Kennedy).

The thrift was even less attractive to investors at that point than it was when Admiral acquired it. Despite his earlier decision to disregard Mr. Teed's negative assessment of merger options, in his subsequent correspondence when handing over the reins to Haven's new management, Mr. Popham makes a compelling case for the obvious:

> [I]t would be very difficult to convince someone that they should buy us or merge with us if we have no reasonable expectation of returning to profitability on our own, regardless of the level of new capital required.

Memorandum from Mr. Popham to Robert Stickler, Haven's President ("Unfinished Projects")(Aug. 29, 1989).

In that same memorandum, Mr. Popham warns of the practical consequences of holding onto the contributed real estate: "I would stress to you that your own projections indicate that Haven Federal's operating losses will cause the association to become insolvent before the end of this fiscal year, unless a merger or capital infusion takes place." *Id.* The draconian legal consequence of such a course of action also was not lost on Mr. Popham. The effect of missing the RCMA's liquidation deadlines—forfeiture of the entire investment—is enough by itself to deter any rational investor. Indeed, this feature of the RCMA was in his estimation, the "single biggest factor" preventing outside investment or the possibility of merger. *Id.* These observations, articulated in August were, of course, equally valid back in March, if not earlier.

By now the estimate of the capital needed was double Mr. Teed's April estimate of $5 million. In the letters Mr. Popham sent to woo outside capital he mentions $10 million. In Admiral's SEC 10(K) filing, as of June, 1989, the figure is $12 million. That was near the mark—by 1990, the capital deficit was estimated at $7.6 million, and that does not include the inevitable write-off of the non-existent TSC sales and service business, booked at $4.1 million.

Mr. Popham's efforts at seeking outside capital for Haven—Pollyannish or mere window-dressing—cannot divert from the fact that it was irrelevant to Admiral's obligations under the RCMA. Admiral was required to contribute the needed capital. It could not meet its contractual obligations by selling Haven to someone else.

Finally, on August 2, a week before FIRREA was signed, Mr. Teed took the step he had warned three months earlier he would take if Admiral did not live up to its contractual obligations—he removed Mr. Popham from his position as Haven's Vice President and Chief Financial Officer, although he remained in a non-salaried status on the thrift's board of directors. This had a number of consequences. First, as Plaintiff rightly contends, it removed Mr. Popham and the Admiral investors from operating control of Haven. Haven and Admiral were now effectively two separate institutions. But most important for our purposes, it recognized that Admiral would not honor its RCMA obligations. As we shall see, it was the Government's determination that Admiral had repudiated a fundamental element of the contract.

Congress passed FIRREA on August 9, 1989, thereby altering a number of existing regulations under which the Admiral–Haven merger had occurred. As a transitional dispensation, only a limited amount of goodwill could be counted towards the new minimum core capital requirements, and even this amount was to be phased out on December 31, 1994. Moreover, the statute limited the amortization period for goodwill to twenty years, not the 25 years that these parties had agreed upon. *See Admiral,* 54 Fed.Cl. at 252.

By September, as Mr. Popham testified, Admiral had "given up." "[A]s far as Admiral was concerned," said Mr. Popham, "Haven Federal was a discontinued operation." Tr. 265. Admiral's auditors reported:

> [W]e concluded that due to Haven's apparent inability to continue operations without a significant capital infusion or other recapitalization plan, the value of the good will is questionable and appears permanently impaired, and therefore, should be written-off at June 30, 1989.

Letter of Stan Martin, Peat Marwick to Mr. Popham (September 14, 1989). The recommendations of the accounting firm were based, in part, on "Admiral's expressed intent to discontinue its control over Haven." *Id.* Admiral and Haven requested to modify the terms of the Resolution and waive any default under the RCMA. This request was denied. Effectively operating on its own at this point, Haven applied for relief from Section II(C) of the RCMA, the requirement to sell the contributed assets. Letter of Mr. Stickler to Mr. Teed (September 26, 1989); Tr. 262–63.

On September 30, 1989, the "cure" compliance period closed with Haven still out of regulatory compliance. Haven had a $4.1 million deficit. On October 17, the OTS agreed to suspend the RCMA's liquidation

requirement pending formal modification of the Resolution.

Haven continued to experience losses in the quarter ending in December of 1989, resulting in its inability to meet its minimum capital even including supervisory goodwill in its calculation. Finally, on February 2, 1990, the OTS recommended conservatorship due to the thrift's unsafe and unsound level of capital, the likelihood of additional losses due to its negative interest margin, its low ratio of earning assets to interest-bearing liabilities, operating losses averaging $600,000 a month in late 1989, and offers on its remaining contributed real estate substantially below the appraised value, indicating that continuing sales would further deplete capital. Mr. Teed's "S Memorandum" for Mr. Smuzynski, OTS Director for Supervision Operations (February 1, 1990); Tr. 907–08. The bank was seized in March 1990 with a deficit in excess of $23 million; Admiral's formal ownership of Haven terminated when the OTS appointed the RTC as receiver for it. Notice of OTS appointment of Receiver (March 1, 1990).

## C. Prior Material Breach

Repudiation—a breach of contract characterized by prospective nonperformance—may excuse the Government's performance. Repudiation occurs when a party owing performance indicates by word or deed that it will commit a breach that would of itself give the injured party a claim for damages for total breach. RESTATEMENT (SECOND) OF CONTRACTS § 250 (1981). To warrant a claim for total breach, the resulting nonperformance "so substantially impairs the value of the contract to the injured party *at the time of breach* that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." REST. 2D at § 243(4)(emphasis added). If we conclude that Plaintiff's violations of the RCMA reach this mark—prior to the Government's own breach in FIRREA—then Defendant is excused from its contractual promises regarding the treatment of supervisory goodwill. REST. 2D at § 253(2). The Plaintiff would not, therefore, be entitled to damages stemming from FIRREA.

In determining the materiality of a breach we review the totality of events and circumstances. *Stone Forest Indus., Inc. v. United States,* 973 F.2d 1548, 1552 (Fed.Cir.1992) (citing REST. 2D at § 241). This flexible approach examines the nature and effect of the breach in light of how the contract was viewed, bargained for, entered into, and performed. *id.*

We find that Admiral's failure to infuse cash into Haven to bring it into regulatory capital compliance, its futile efforts to find outside sources, and its persistent denial of its ability to supply the needed capital, did indeed substantially impair the value of the contractual exchange to the Government. On June 30, 1989, Admiral formally violated the terms of the contract. The parties argue whether this event was a "breach," a "default," or merely the trigger for an additional compliance period. Whatever label we give it, the violation went to the heart of the benefit of the bargain for the FSLIC.

We recognize that the violation could have been cured, of course. And here Plaintiff had the contractual right to do so. There is some merit to the argument that Plaintiff cannot materially breach a contract that they are still legally entitled to perform. But we also cannot turn a blind eye to the evidence which clearly demonstrates that Admiral had neither the capacity nor the intention to cure Haven's capital deficit, that they by "word and deed" demonstrated their prospective non-performance.

The fact that FIRREA was passed in the middle of Admiral's cure period is sheer happenstance. It makes the prior breach argument a bit more interesting as to the timing of the parties' competing breaches. But it does not change the legal effect of Admiral's earlier rejection of its RCMA's obligations. There is no compelling evidence indicating that this non-performance was affected by the emerging new law.

First, the impact of the statute was not felt immediately, and in this case, it was never felt. December 7, the "date that will live infamy," is also noteworthy because it is the date that FIRREA's regulations became effective, and is the date for accrual of the

claims in all *Winstar* cases. *See Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174 (1997). This date falls well beyond Admiral's opportunity to cure the RCMA deficit, and occurs long after Admiral had completely given up on its investment. Plaintiff clearly demonstrated and articulated that it had no intention or capability to comply with regulatory capital requirements well before the statute was passed August 9, 1989.

Second, we find that Plaintiff could not sufficiently recapitalize Haven through the liquidation of its assets. The Westview sale at a loss and consistently low offers for other parcels show that continued sales would have drastically reduced capital, requiring Admiral to infuse additional money under the RCMA. Plaintiff freely admits Haven's regulatory capital might have been in far better shape were the thrift allowed to hold onto the real estate. *See,* Minutes of Admiral's Board of Directors' meeting (September 14, 1989) (pinning responsibility for the loss of capital on "fire sale" conditions resulting from forced liquidation); *see also,* Letter of Haven's Board of Directors to Mr. Teed (May 3, 1989)("the real estate and business community has become aware of our predicament and the interests of 'vulture capital' have been aroused.") Holding onto the property was not an option, of course, as the liquidation schedule stretched over the first two years of the contract. After Admiral and Haven "separated," Admiral pressed for sales of the property, presumably to avoid a violation of the sales schedules, while Haven sought and was eventually granted relief from the requirement.

Finally, the evidence shows that outside investment—Admiral's first and only refuge—was deterred by reasons wholly independent of the impending loss of supervisory goodwill. It was not the provisions of FIRREA but rather operating losses, the vagaries of the real estate market combined with the lack of a financial commitment on the part of Admiral, that caused Haven to fail. According to Mr. Popham's own "Unfinished Projects" memorandum dated August 29, after he was removed from management decisions, the largest difficulty in luring investors was the threat of the RCMA's forfeiture clause relating to the obligation to liquidate real property.

Under the circumstances, we do not believe the 90–day period commencing after the June 30 default shields Admiral from liability for its own breach. The opportunity to cure is not an invitation to be a spectator to the downfall of the thrift. FIRREA can excuse the performance only of an investor who demonstrated a willingness and ability to perform prior to that statute's enactment. *See Record Club of Am., Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1274 (2d Cir.1989); 9 Arthur L. Corbin, CORBIN ON CONTRACTS § 978 (Interim ed.2002). After two weeks of trial, the Court is left with the same impression Mr. Teed apparently had as early as April—Admiral was not capable of saving the thrift and never was.

We conclude that Mr. Popham's repeated disavowals of any intention to infuse capital constituted the effective rejection of any intention to honor the RCMA before the notice and cure time expired. Admiral's own analysis, revealed in discussions with Haven's Board of Directors and letters to regulatory authorities, are enough to convince us that the Plaintiff did not have the capacity, irrespective of FIRREA, to revive its investment in Haven. In Mr. Popham's contemporaneous correspondence, blame is placed where it belongs, not on the statute but on the thrift's insufficient real estate capitalization. No cure period was going to enable Admiral to meet its end of this bargain, absent the help of a third party. Mr. Popham, himself, recognized in seeking help from outside investment "a temporary 'cure' of the current capital deficiency is not sufficient." Letter of Mr. Popham to IBJ Schroder Bank & Trust Company (May 8, 1989).

With such a candid assessment of doom, it is no surprise that the Bank Board on August 2, 1989, removed Mr. Popham, the man who initiated this entire supervisory transaction, from his position as Executive Vice President and Chief Financial Officer of Haven. Mr. Popham's removal, along with other measures taken by the Bank Board, effectively stripped Admiral of control over the management of the assets it invested in the thrift. The evidence convinces us that this

action constitutes the Government's recognition that Admiral had repudiated the contract. Though the Government certainly could have elected to exercise the remainder of its remedies under the RCMA at this time, Mr. Teed's immediate response began a sequence of events that were eventually embraced by Admiral a few months later when it sought official relief from its obligations under the RCMA.

### D. Admiral's Avoidance Arguments

The Plaintiff urged upon the Court Mr. Popham's removal and a number of other "avoidance defenses" to rebut the prior breach argument. At trial, Plaintiff presented evidence that showed the regulators took an active role in supervising both the merger and the subsequent management of the new thrift. According to Plaintiff, this supervision frustrated Admiral's ability to make Haven thrive.

The evidence showed nothing of the sort. The regulatory oversight complained of was nothing more than what is to be expected of a comprehensively regulated industry and especially of a MACRO 4 thrift—and almost a 5. MACRO 4 thrifts were prohibited from growth, except to meet interest accrued on deposits. Moreover, growth under the approved business plan was always predicated—as Mr. Teed would remind Admiral—on the liquidation of the real estate. The Plaintiff could point to many instances in which Mr. Teed disapproved of steps Mr. Popham proposed: acquisition of Bricklebanc four days after the April 1988 merger, with $1 million of United States money; spin-off of problem assets; advance authorization to buy additional branches; the GNMA investment strategy, and so forth. There was also evidence that, when matters started to go awry, Mr. Teed restricted Admiral's ability to elect new directors for the thrift. But Plaintiff could point to no instance in which a supervisory refusal was anything other than prudent bank oversight. And except for one instance that never matured into a serious complaint, Admiral never challenged Mr. Teed's disappointing but fully justified decisions. Tr. 265–66 (Popham). The Plaintiff offered no evidence of bad faith.

### E. Admiral Was Not Harmed by FIRREA

Although we are confident the Government has proven a prior material breach at trial, Plaintiff's damage claim also fails on an alternative ground. The enactment of FIRREA was clearly not the cause of Haven's demise. As early as December 1988, well before any real estate had to be sold, and before FIRREA was even proposed by the newly-elected President, the bank examiner in charge of the Admiral–Old Haven transaction concluded that the bank was already running operational deficits, and would continue to do so in the future. After two early sales, the total regulatory capital value of the contributed real estate had decreased to approximately $5 million as of December 31, 1988. Tr. 1071–73. The sales resulted in only 5 percent of the total value of contributed real estate.

The bank was officially given a MACRO rating of 4, but it is clear that Haven might equally have received a MACRO rating of 5. Mr. Blum's notes on the December examination confirm what we have found to be the case: "There [was] no seller/ service business. All tax certificates are being held by the associations in its own portfolio. So there is no cash flow." Notes of Mr. Blum on Non–Real Estate Contributed Properties (February 7, 1989); Tr. 1082–86. Even at this early stage it was quite clear that the $4.1 million in goodwill represented by the TSC business so-called asset was, in Mr. Blum's colorful words "just a pie in the August 25, 1987 sky and should be written off." *Id.* After discussing his concerns with his supervisor, Mr. Blum was persuaded to rate the thrift a 4, in order to give the new management of Haven a chance to succeed, Tr. 1066–67. Mr. Blum did not include these doomsday assessments in his formal report but he recognized that sooner or later the TSC goodwill would be written off.

Admiral attempted to prove that FIRREA drastically diminished its ability to maintain regulatory capital. As evidence of this they cited a consolidated financial statement written by Peat Marwick on August 18, 1989, stating that Haven did not expect to meet

FIRREA's new capital requirements. Its language showed a marked concern about the effect of the statute that had just been passed.

Certainly, FIRREA did not help matters. As Mr. Popham stated, the goodwill on the books of the association, which had been a benefit for an acquirer under the previous legislation, was now, post-FIRREA, a definite liability. A new acquirer would have to first make up for the goodwill, and then address the remaining capital deficiency— $22 million instead of $12 million. Tr. 260–61 (Popham). But even without FIRREA, it was still $12 million.

Notwithstanding these efforts to describe the impact of FIRREA on the supervisory goodwill capital, we are persuaded by the plethora of evidence showing that the thrift was in such dire straits that it was failing under pre-FIRREA capital requirements. The failed capitalization plan, overvalued real estate holdings, and lack of a financial commitment by the Initial investors "contributed to the thrift's decline and led ultimately—and independent of the supervisory forbearance—to its seizure." *Barron Bancshares, Inc. v. United States*, 53 Fed.Cl. 310, 326 (2002).

Haven was, of course, never returned to capital compliance. Had all its goodwill been counted toward its regulatory capital, Haven would still have been insolvent: Haven had negative core capital as of December 31, 1989. This means that even if Admiral had been able to replace all of Haven's goodwill with cash on September 30, 1989, Haven would still have been at least $4 million formally below its minimum capital requirement, and perhaps more than $10 million, counting expected real estate losses, and a write-off of the TSC business. It would then still be subject to all of the regulatory enforcement options that FSLIC never contracted away.

## CONCLUSION

Because we find Plaintiff repudiated the contract prior to the Government's breach, Plaintiff is not entitled to damages for breach of contract. Accordingly, the Clerk of Court shall enter judgment for the Defendant on Counts III and IV of Plaintiff's Complaint.

Furthermore, we dismiss Counts I and II, the stayed claims alleging takings without just compensation under the Fifth Amendment to the Constitution. Because we previously granted, in part, Plaintiff's motion for summary judgment, and found that the transaction at issue constituted a contract, Plaintiff can no longer maintain its Constitutional claims in the alternative. Moreover, recent precedent dictates the dismissal of these counts irrespective of our rulings on the contractual claims. *See Castle v. United States*, 301 F.3d 1328 (Fed.Cir.2002), *cert. den'd*, —— U.S. ——, 123 S.Ct. 2572, 156 L.Ed.2d 602 (2003).

**The Clerk of Court is directed to dismiss the Complaint with prejudice and enter judgment for the Defendant.** No costs.

**IT IS SO ORDERED.**