GRANITE MANAGEMENT
CORPORATION,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–515C.

United States Court of Federal Claims.

Dec. 16, 2003.

Charles J. Cooper, Washington, D.C., attorney of record for plaintiff and Michael W. Kirk, David H. Thompson and Elisebeth B. Collins, of counsel, Washington, D.C. Michael

A. Kahn, Richard Keenan and Michael F. Kelleher, of counsel, San Francisco, California.

Delfa Castillo, Department of Justice, Washington, D.C., and David C. Hoffman, Arlene Pianko Groner and Tarek Sawi, of counsel, with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for defendant. David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director.

## OPINION

FUTEY, Judge.

This *Winstar*-related case is before the court on defendant's motion for summary judgment on damages and plaintiff's cross-motion for partial summary judgment. Defendant maintains that plaintiff's reliance and restitution claims are based on net liabilities assumed and, therefore, precluded by precedent of the United States Court of Appeals for the Federal Circuit (Federal Circuit). Defendant also contends that, in the event the court were to hold that net liabilities assumed could be utilized, there were no net liabilities in this case because plaintiff certified that the value of the branching rights it acquired equaled the net liabilities assumed. Defendant also avers that plaintiff has not shown "losses actually sustained" and that the benefits plaintiff received outweigh any costs. Defendant asserts that plaintiff's "avoided liquidation costs" and "enhanced investment income" claims are premised on the incorrect assumption that the thrifts would have been liquidated. Defendant maintains that plaintiff has not demonstrated reasonable certainty, causation, or foreseeability. Further, defendant avers that plaintiff's "lost value" models improperly calculate damages through the use of hypothetical preferred stock models. Defendant also asserts that plaintiff could not have sold its supervisory capital because it is not transferrable. Defendant contends that the proper measure of cost of replacement is transaction or floatation costs.

Plaintiff avers that its reliance and restitution claims are distinguishable from the mod-els rejected in *Glendale* and its progeny because its models are based on "losses actually sustained . . . ." Plaintiff avers that the character of its net liabilities assumed distinguishes its claim because the net liabilities in this case were the result of "bad assets" rather than high interest rates. Plaintiff contends that its scenario is factually distinguishable from that in *Glendale* and that it should be given the opportunity to prove at trial the benefit it conferred on the government in terms of "avoided liquidation costs" and "enhanced investment income."[1] Plaintiff maintains that its damage calculation has been offset by the benefits it received. Plaintiff asserts that there is a genuine issue of material fact as to reasonable certainty, and cross-moves for summary judgment on the issues of foreseeability and causation. Further, plaintiff avers that its preferred stock models properly quantify the costs of its parent company's capital infusion, and "lost value" upon the thrifts' sale. Plaintiff also contends, in the alternative, that it is entitled to recover the cost of replacing the supervisory capital that was eliminated by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989).

### Factual Background

As this case is a *Winstar*-related case, it is unnecessary to revisit the history of the savings and loan crisis. This has been done extensively in prior opinions of the United States Supreme Court, the Federal Circuit, and this court. See, e.g., *United States v. Winstar Corp.*, 518 U.S. 839, 843–56, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Bluebonnet Sav. Bank, FSB v. United States*, 47 Fed.Cl. 156, 158 (2000), *rev'd*, 266 F.3d 1348, 1354–55 (Fed.Cir.2001). Extensive background facts were set forth in the court's opinion on liability and will not be repeated in detail here. See *Granite Mgmt. Corp. v. United States*, 53 Fed.Cl. 228, 230–35 (2002). Only general background facts and facts relevant to damages, therefore, will be set forth herein.

---

1. In other words, plaintiff contends that the government benefitted from not having to expend funds to liquidate the thrifts and from being able to earn a return on the funds allegedly saved.

In 1986, plaintiff, Granite Management Corporation, acquired the thrifts that form the basis of this suit.[2] On June 27th, plaintiff acquired State Savings & Loan Company of South Euclid, Ohio, and Citizens Home Savings Company of Lorain, Ohio (Ohio transaction). On December 22nd, plaintiff acquired St. Louis Federal Savings & Loan Association of St. Louis, Missouri (Missouri transaction), and on December 29th, plaintiff acquired Lincoln Federal Savings & Loan of Louisville, Kentucky (Kentucky transaction). Pursuant to the Assistance Agreements in the Missouri transaction and the Kentucky transaction, the government made cash contributions of $75,000,000 and $93,000,000, respectively. Further, as a result of the three transactions, the following intangible assets were recorded: 1) Ohio transaction: $57,721,000; 2) Missouri transaction: $71,793,000; and 3) Kentucky transaction: $19,589,000. The total amount of the intangible assets equaled $149,103,000.[3]

The year 1989 bears particular significance in *Winstar*-related cases. On August 9th of that year, FIRREA was enacted. FIRREA and its implementing regulations changed the capital requirements applicable to thrifts, imposing core capital, tangible capital, and risk-based capital requirements. Specifically, FIRREA provided, in pertinent part, that supervisory goodwill could not be counted toward tangible capital, and that the role of supervisory goodwill in meeting core and risk-based capital requirements would be greatly diminished. FIRREA also required that the remaining amounts be phased-out within a five-year time frame. As applied to the facts of this case, although the parties disagree as to the exact amount of regulatory capital that existed in 1989 as a result of the three transactions,[4] plaintiff's expert quantifies the unamortized balance at $274,228,000.

While the parties dispute its cause, it is undisputed that in December 1990, Ford Motor Company (Ford), plaintiff's parent company, infused $250,000,000 in capital into the holding company, which in turn infused the money into First Nationwide Bank (FNB).[5] Plaintiff contends that the regulators insisted that Ford infuse additional capital to strengthen the capital ratios that had been reduced as a result of FIRREA. Plaintiff also avers that the regulators would not allow it to issue subordinated debt. Conversely, defendant asserts that the real estate recession in California, and lack of income from its real estate development business, were factors unrelated to FIRREA which caused Ford to infuse the capital. Defendant also maintains that contrary to plaintiff's assertion, "[t]he regulators did not simply prefer capital, but were statutorily constrained from recognizing subordinated debt as capital." [6]

Subsequently, in 1993, Ford sought the assistance of Mr. Joseph Walker, Head of J.P. Morgan's Mergers and Acquisitions Group, in structuring the sale of the bank and locating an acquirer. Senior Management from FNB and Ford took a "hands-on" approach, and worked alongside Mr. Walker and his team during negotiations. Following an extensive screening process, three prospective purchasers were invited to participate in final negotiations, which occurred in March and April 1994. The parties' final bids were submitted in April 1994, and shortly thereafter, Ford's Board of Directors chose First Madison.

The damages alleged by plaintiff derive from the occurrences discussed above. Plaintiff first asserts that it incurred costs in administering and operating the thrifts acquired through the Ohio, Missouri, and Kentucky transactions. Plaintiff seeks recovery

---

2. Until September 30, 1994, plaintiff was known as First Nationwide Financial Corporation.

3. Appendix To Defendant's Motion For Summary Judgment On Damages (Def.'s App.) at 91–93; see also Defendant's Materials For Oral Argument On Damages, Tab 1.

4. Defendant's Response To Granite Management Corporation's Statement Of Additional Material Facts ¶ 3.

5. FNB was renamed Granite Savings Bank (GSB) in September 1994, and, consequently, GSB merged into plaintiff on June 30, 1995.

6. Defendant's Response To Granite Management Corporation's Statement Of Additional Material Facts ¶ 71.

of its expenditures under both reliance and restitution theories, and quantifies its cost of performance at $307,500,000. Second, plaintiff relies on a "benefits conferred" restitution theory. In particular, plaintiff contends that it conferred a benefit on the government by acquiring the thrifts in the form of "avoided liquidation costs" and "enhanced investment income." Plaintiff alleges that the value of the benefits it conferred on the government equals $421,900,000; $203,500,000 in "avoided liquidation costs" and $218,400,000 in "enhanced investment income." [7]

Third, plaintiff asserts that it is entitled to recover the costs associated with Ford's $250,000,000 capital infusion. Plaintiff relies on Professor Christopher James' preferred stock model to quantify the costs at $104,300,000. Fourth, plaintiff maintains that it was not fully compensated for the sale of the thrifts because it could not sell the supervisory capital that was eliminated (i.e., diminished sale price). Plaintiff proffers two models which purport to identify the amount that a prospective acquirer would have paid for the supervisory capital: 1) Professor James' preferred stock model which places the value at $136,800,000; and 2) Mr. Walker's leverage model and sensitivity analysis which value the supervisory capital at $137,100,000.

Lastly, plaintiff avers, in the alternative, that it is entitled to recover the hypothetical cost of replacing the supervisory capital that was eliminated as a result of the enactment of FIRREA. Plaintiff again relies on Professor James' preferred stock model to calculate "the sum of the annual rental costs that would be required to replace the Supervisory Capital with a close capital substitute." [8] Plaintiff concludes that it would have cost $331,500,000 to replace the $274,228,000 in supervisory capital.

On August 7, 1995, plaintiff filed suit in this court. Following a series of motions and briefs, the case was transferred on February 1, 2002, to the undersigned Judge. The court stayed all non-contractual claims until the breach of contract issue was resolved.

In an opinion dated August 7, 2002, the court held that a contractual relationship existed in all three transactions. In particular, the court found that the contracts permitted plaintiff to use the purchase method of accounting, to amortize the intangible over a twenty-five year period, and to count said asset for regulatory compliance purposes. The court also held that the contracts underlying the Missouri transaction and the Kentucky transaction allowed plaintiff to treat the cash contributions as direct credits toward its regulatory capital. Lastly, the court held that defendant's enactment of FIRREA breached these contracts.

Prior to the current round of briefings on summary judgment, the court directed plaintiff to show cause why its takings claim should not be dismissed in light of the Federal Circuit's decision in *Castle v. United States*, 301 F.3d 1328 (Fed.Cir.2002). As plaintiff could not offer any substantive basis on which to distinguish its takings claim from that in *Castle*, on January 10, 2003, that claim was dismissed. *Granite Mgmt. Corp. v. United States*, 55 Fed.Cl. 164 (2003).

On February 5, 2003, defendant filed its Motion For Summary Judgment On Damages. Plaintiff filed its response and partial cross-motion on March 26, 2003. Defendant filed its reply and opposition on April 23, 2003, and plaintiff replied on May 12, 2003. Pursuant to the parties' request, the court held oral argument on October 28, 2003. Prior to the oral argument, both parties submitted notices of supplemental authority.

### Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS*, 998 F.2d 979, 982 (Fed.Cir. 1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at

---

7. Plaintiff also relies on the calculation of its expert, Mr. Michael Green, which yields a comparable amount.

8. Def.'s App. at 25.

248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514, 518 (1995). It, therefore, does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States,* 26 Cl.Ct. 1011, 1014 (1992)).

I.  Restitution

Plaintiff relies on the alternative theories of restitution set forth by the Federal Circuit in *Landmark:*

> The first is the value of the benefits received by the defendant due to the plaintiff's performance. The second is the cost of the plaintiff's performance, which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract.

*Landmark Land Co., Inc. v. United States,* 256 F.3d 1365, 1372 (Fed.Cir.2001); see also *Westfed Holdings, Inc. v. United States,* 55 Fed.Cl. 544, 561 (2003). When a plaintiff relies on the second theory of restitution, a theory premised on the non-breaching party's expenditures, "the award can be viewed as a form of reliance damages, wherein the non-breaching party is restored to its pre-contract position by returning as damages the costs incurred in reliance on the contract." *LaSalle Talman Bank, FSB v. United States,* 317 F.3d 1363, 1376 (Fed.Cir.2003).

"The idea behind restitution is to restore—that is, to restore the non-breaching party to the position he would have been in had there never been a contract to breach." *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001) (citing *Acme Process Equip. Co. v. United States,* 171 Ct.Cl. 324, 347 F.2d 509 (1965)). The basic premise of restitution involves extracting any benefit conferred on the breaching party and restoring it to the non-breaching party. *Id.* at 1380–81 (citing Restatement (Second) of Contracts § 344(c) (1981)). This amount must be offset by any benefit that the non-breaching party received. *Westfed Holdings,* 55 Fed.Cl. at 561. Restitution is only available in cases of total breach. *Cal. Fed. Bank, FSB v. United States,* 43 Fed.Cl. 445, 450 (1999) (citing Restatement (Second) of Contracts § 373 cmt. a), *vacated in part,* 245 F.3d 1342 (Fed.Cir.2001); *Hansen Bancorp., Inc. v. United States,* 53 Fed.Cl. 92, 99–104 (2002).

Plaintiff contends that its case is distinguishable from the *Glendale* line of cases decided by the Federal Circuit. Plaintiff avers that its restitution claim is not based on net liabilities assumed, but rather on actual cost of performance under the contract. Plaintiff also asserts, in the alternative, that it is entitled to recover the benefit it conferred on the government in the form of "avoided liquidation costs" and "enhanced investment income." To support

its arguments, plaintiff touches on many of the factors discussed in *Glendale*. Plaintiff maintains that its losses were due to "bad assets," rather than high interest rates and, therefore, time was conclusively the thrifts' enemy, rather than their possible friend. Plaintiff contends that the government in this case did not have "the option of hiring new and better management ... and mak[ing] a go of it ...." *Glendale*, 239 F.3d at 1382. Plaintiff also attempts to downplay the government's contingent liability by arguing that the acquisitions in this case represented a "permanent solution."[9]

Defendant maintains that plaintiff's restitution claim is based on net liabilities assumed and, therefore, barred by *Glendale*, *Cal. Fed.*, and *LaSalle Talman*. Defendant contends that net liabilities assumed are not a proper measure of the benefit conferred on the government. Defendant avers that if the court should rely on net liabilities assumed, there were none in this case as plaintiff certified that the value of branching rights equaled the value of net liabilities assumed. Moreover, as to "avoided liquidation costs" and "enhanced investment income," defendant asserts that those alleged benefits are too speculative. Defendant avers that the alleged benefits are premised on an incorrect assumption that the thrifts would have been liquidated. Defendant maintains that liquidation was not its only option. Defendant also relies on its contingent liability.

### A. *Avoided Liquidation Costs & Enhanced Investment Income*

Plaintiff asserts that it is entitled to recover the benefit that it conferred on the government. Plaintiff quantifies the benefit in terms of "avoided liquidation costs" and "enhanced investment income." Plaintiff maintains that this claim is not based on net liabilities assumed, but rather on "the government's own assessments"[10] of its savings. Plaintiff proffers the views of two experts who quantified the benefit conferred on the government. Professor James concludes that the benefit conferred amounted to $421,900,000. Mr. Michael Green places the benefit conferred at $413,378,000.

Opinions from this court addressing the issues of "avoided liquidation costs" and "enhanced investment income" have covered the full range of the spectrum. See *Franklin Fed. Sav. Bank v. United States*, 55 Fed.Cl. 108, 118–20 (2003). In *Citizens*, this court determined that *Glendale* barred the plaintiff's "benefits conferred" restitution claim based on net liabilities assumed as a matter of law. *Citizens Fed. Bank v. United States*, 52 Fed.Cl. 561, 566 (2002) ("[T]he overall uncertainty with the remedy is the impossibility of ascertaining the exact benefit conferred on the government .... The true benefit to the government was time ...."). Other cases addressing the issue have not read the precedential value of *Glendale* as expansively. For example, in *Suess* and *Franklin Federal*, while this court stated that *Glendale* barred the plaintiffs' respective "benefit conferred" claims, the court nevertheless engaged in an analysis of the multiple factors set forth in *Glendale*. *Franklin Fed.*, 55 Fed.Cl. at 119–20; *Suess v. United States*, 52 Fed.Cl. 221, 229–31 (2002).

According to plaintiff, its claims are distinguishable from all those that have been previously analyzed by this court because its claims are not based on net liabilities assumed, but on the government's own assessment of the savings. The focus on which party assesses the value of the savings, however, is misplaced. The mere fact that the government compiled the assessment does not *per se* make plaintiff's claim any less speculative. Rather, plaintiff must show that the benefit it conferred is neither speculative nor indeterminate. As this court stated in *Westfed Holdings*, such a showing is made where plaintiff "prove[s] ... that liquidation was defendant's only alternate method of disposal to the acquisition by plaintiff."

---

9. Plaintiff's Brief In Opposition To The Government's Motion For Summary Judgment On Damages And In Support Of Plaintiff's Cross–Motion For Partial Summary Judgment (Pl.'s Brief) at 13 n. 11.

10. *Id.* at 11.

*Westfed Holdings,* 55 Fed.Cl. at 561. As distinguished from *Westfed Holdings,* submitting plaintiff's "avoided liquidation costs" and "enhanced investment income" claims to trial would be an exercise in futility. There is sufficient evidence before the court to support the conclusion that the government would not have liquidated the thrifts absent plaintiff acquiring them.

The government in this case, as in other *Winstar*-related cases, retained a contingent liability. *Glendale,* 239 F.3d at 1382; *S. Cal. Fed. Sav. & Loan Ass'n v. United States,* 57 Fed.Cl. 598, 624 (2003) (explaining that a fatal deficiency in the plaintiff's claim was its failure to rebut the government's contingent liability). There were also other potential acquirers who were interested in purchasing the thrifts.[11] See *Glendale,* 239 F.3d at 1382. In the event that those deals would not go through, the government had the option of reopening the bidding.[12] Further, as the government indicated at oral argument, neither it nor plaintiff ever liquidated the thrifts, and liquidation was an extremely rare and disfavored occurrence.[13] *Admiral Fin. Corp. v. United States,* 57 Fed.Cl. 418, 424 (2003) (refusing to award "liquidation cost savings" because "restitution cannot be measured in terms of a 'liability that never came to pass, and based on a speculative assessment of what might have been . . . .'" (quoting *Glendale,* 239 F.3d at 1382)). The *Franklin Federal* court's statement accurately characterizes the uncertainty in plaintiff's claims, that "[i]t is inherently speculative to try to figure out now what the Government might have done, under different circumstances, nearly a decade and a half ago." *Franklin Fed.,* 55 Fed.Cl. at 120. Accordingly, given the above-mentioned factors, defendant is entitled to summary judgment on

plaintiff's "avoided liquidation costs" and "enhanced investment income" claims.[14] *Admiral Fin.,* 57 Fed.Cl. at 424.

### B. *Cost of Performance*

Plaintiff contends that it should recover in restitution the cost of performance under its contracts with the government. From the parties' briefs, it appeared that plaintiff's reliance and restitution claims seek to recover an identical amount.[15] Plaintiff was given the opportunity at oral argument to demonstrate any material differences between its restitution and reliance cost of performance theories; although plaintiff conceded that there was no substantive difference between the two theories, plaintiff indicated that the sole difference in the analysis would concern causation.[16] In the event that the two theories could yield duplicative results, this court has been inclined to base any award on a reliance theory. See *Westfed Holdings,* 55 Fed.Cl. at 561 (declining to address the plaintiff's cost of performance restitution claim where reliance damages in the same amount were awarded). The Federal Circuit has also indicated that a restitution claim based on a plaintiff's expenditures "can be viewed as a form of reliance damages . . . ." *LaSalle Talman,* 317 F.3d at 1376. The court, therefore, will simultaneously analyze plaintiff's restitution cost of performance claim with its reliance claim.

### II. Reliance Damages

Defendant asserts that both of plaintiff's cost of performance claims are based on net liabilities assumed and, therefore, precluded by *LaSalle Talman.* Defendant also avers that there were no net liabilities because plaintiff was fully compensated through

---

11. Transcript of Oral Argument (Tr.) at 7–8.

12. *Id.* at 9.

13. *Id.* at 10.

14. The court, therefore, does not have to reach defendant's argument that plaintiff's "enhanced investment income" claim is a claim for prejudgment interest. See Defendant's Motion For Summary Judgment On Damages (Def.'s Mot.) at 21 n. 18.

15. Compare Pl.'s Brief at 6 (explaining that plaintiff is entitled to recover in restitution actual net costs in the amount of $307.5 million) with Def.'s Mot. at 2 (noting that plaintiff seeks $307.5 million under a cost of performance reliance theory); see also Plaintiff's Notice of Supplemental Authority at 8.

16. Tr. at 57–58; see also Pl.'s Brief at 11 (relying on *Mobil Oil Exploration, Prod. Southeast, Inc. v. United States,* 530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000)).

branching rights. Further, defendant maintains that plaintiff has failed to show "losses actually sustained as a result of the breach . . . ." *Glendale*, 239 F.3d at 1382. Defendant also challenges the manner in which plaintiff's experts arrive at their calculation of "losses actually sustained . . . ." Defendant asserts that plaintiff has not properly accounted for the benefits it received from the transactions, and if properly calculated, the benefits outweigh the costs. In addition, defendant contends that plaintiff has not established reasonable certainty, causation, or foreseeability.

On the other hand, plaintiff maintains that it has demonstrated "actual losses." Specifically, plaintiff relies on Professor James' calculations and Mr. Roger Orders' forensic accounting conducted pursuant to the Securities and Exchange Commission's "carve-out" guidelines. Plaintiff asserts that Mr. Orders' financial statements are sufficiently certain or, at a minimum, create a genuine issue of material fact. Further, plaintiff cross-moves for summary judgment on causation. Plaintiff contends that defendant's causation argument sets forth an incorrect interpretation of the parties' respective burdens. Plaintiff avers that it is entitled to summary judgment since defendant has failed to come forward with any evidence that "plaintiff would have suffered the claimed reliance damages even if the contract had been fully performed."[17] Plaintiff also cross-moves on the issue of foreseeability. Plaintiff, relying on *Coast Federal Bank, FSB v. United States*, 48 Fed.Cl. 402, 423 (2000), *aff'd*, 323 F.3d 1035 (Fed.Cir.2003), maintains that it need only demonstrate that the "type of damages" was foreseeable.[18] Plaintiff does, however, make an argument that the magnitude of the loss was also foreseeable.

■ The purpose of reliance damages is to compensate a plaintiff "who relies on another party's promise made binding though contract [by] damages for any losses actually sustained as a result of the breach of that promise." *Glendale*, 239 F.3d at 1382 (citing Restatement (Second) of Contracts § 344(b)). In the *Winstar* context, reliance damages "provide a firmer and more rational basis [for measuring the losses actually sustained]" than other damage theories. *Id.* at 1383. Damages which are recoverable under a reliance theory typically include expenditures made "in preparing to perform, in performing, or in foregoing opportunities to make other contracts." Restatement (Second) of Contracts § 344 cmt. a. A plaintiff seeking reliance damages is constrained by traditional contract limitations: causation, reasonable certainty, and foreseeability. *Cal. Fed.*, 43 Fed.Cl. at 451.

■ During the course of oral argument, it became apparent that plaintiff's cost of performance claims included net liabilities assumed; as a matter of fact, plaintiff admitted that its costs were based on paying liabilities as they came due.[19] Following this concession, it likewise became apparent that the thrust of plaintiff's argument actually involved distinguishing the net liabilities that it had assumed from the net liabilities assumed in *Glendale, Cal. Fed.*, and *LaSalle Talman*. In particular, plaintiff relied heavily on the character of the net liabilities, arguing that its net liabilities were based on "bad assets" rather than high interest rates.[20] Plaintiff also focused on the fact that it paid out its liabilities over time rather than simply aggregating the liabilities over assets at the time the contracts were executed.[21] In this same vein, plaintiff alleged that this demonstrates that its costs were not

---

17. Pl.'s Brief at 16 (quoting *Hansen*, 53 Fed.Cl. at 99)

18. Although the Federal Circuit affirmed *Coast*, it did not comment on the issue of foreseeability. The court notes that the Federal Circuit has held that both the magnitude and the type of damages must be foreseeable. *Landmark*, 256 F.3d at 1378 (citing 5 Arthur Corbin, Corbin on Contracts § 1012, at 88 (1964)).

19. Tr. at 52.

20. *Id.* at 56 (explaining that the fact that the loans in *Glendale* were being paid back is a "key difference in this case"); *see also id.* at 60 ("In this case the loans were bad. They're not being paid back. That really is the essence of this case."); *Id.* at 65 ("crucial distinction").

21. *Id.* at 66–67.

"paper calculations" and took into account subsequent events.

As an initial matter, the court discerns no material difference between aggregating the net liabilities on the date the contracts were entered into and treating the net liabilities as an actual cost over the term of the contract. Under either calculation, "the results of the analysis would be unchanged . . . ." *Glendale Fed. Bank, FSB v. United States*, 54 Fed.Cl. 8, 13 (2002). Once plaintiff concedes that it included the entire amount of net liabilities assumed on the date of acquisition in its damages calculation, its fragmentation of those net liabilities "does nothing to alter the reality that [the expert's] analysis is premised on treating the initial supervisory goodwill figure-that is, the mark-to-market value of [the] excess liabilities—as [the] principal cost or investment." *Id.*

The inquiry, therefore, turns to the crux of plaintiff's argument, its "bad asset"/high interest rate distinction. Decisions of this court have given some, albeit limited, attention to this issue. As is prevalent throughout most issues in the *Winstar* context, however, the opinions reach divergent conclusions. To begin, in *Citizens*, the plaintiff argued that it had assumed actual liabilities which led to real losses. *Citizens*, 52 Fed.Cl. at 565. Specifically, the plaintiff alleged that its liabilities "stemm[ed] from operating losses as well as the lessened qualities of . . . assets." *Id.* The *Citizens* court nevertheless refused to accept the argument that "lessened qualities of . . . assets" provided a substantive basis upon which to distinguish *Glendale*. *Id.* Rather, the *Citizens* court explained that "while the Federal Circuit in *Glendale* found the lack of an actual net liability as illustrative of the speculative nature of restitution, the overall uncertainty associated with that remedy is the impossibility of ascertaining the exact benefit conferred on the government." *Id.* at 566.

On the other hand, *Franklin Federal* touched upon the issue in the context of a reliance claim. While *Franklin Federal* did not expressly address a "bad asset" argu-

ment, it did emphasize the impact high interest rates had on the net liabilities assumed in *Glendale* and *Cal. Fed.* The *Franklin Federal* court noted that the plaintiffs' factual scenario was distinguishable from that in *Glendale* and *Cal. Fed.* because they did not enjoy the benefit of the decade-long decline in interest rates. *Franklin Fed.*, 55 Fed.Cl. at 119–21. *Franklin Federal*, therefore, did give some credence to the distinction.

The fact that "bad assets" were a component of the net liabilities assumed could conceivably result in actual costs. The net liabilities assumed would not disappear from a decline in interest rates and would need to be paid out as they were due. Indeed, several plaintiffs in *Winstar*-related cases have based their damages theories on the alleged actual payment of liabilities. *LaSalle Talman*, 317 F.3d at 1376 (noting that the plaintiff argued that "assumed liabilities [were] a standard accounting cost, that [it] was obligated to pay the assumed liabilities as they became due and did so pay . . . ."); *Citizens Fin. Servs. v. United States*, 57 Fed.Cl. 64, 67 (2003) (discussing the plaintiff's argument that damages should be measured by the amount of "liabilities it assumed and paid"); *Franklin Fed.*, 55 Fed.Cl. at 117 (explaining that the plaintiffs argued that they "[were] required to pay off the entire amount" of excess liabilities and that "the liabilities constituted real costs and required real expenditure"); *Glendale*, 54 Fed.Cl. at 12 (describing that the plaintiff began its operational losses calculation by "adding up *all* of the . . . liabilities *paid* through 1994").

It is inappropriate, however, to argue that the liabilities were paid as they came due and yet include the entire amount of net liabilities assumed on the date of the acquisitions in the cost of performance calculation. Plaintiff admitted at oral argument that its cost of performance model includes the entire amount of net liabilities assumed.[22] A "bad asset" distinction does nothing to cure this deficiency; plaintiff's cost of performance calculation still equates the entire amount of net liabilities assumed to an actual loss or

---

**22.** Tr. at 63–64, 67–68; see also Defendant's Materials For Oral Argument On Damages, Tab

1.

cost. *S. Cal.*, 57 Fed.Cl. at 631 (explaining that the plaintiff must demonstrate "that it actually paid down these liabilities—an absolute requirement for reliance damages"). In other words, plaintiff's argument is superficial as its underlying construct improperly assumes that the entire amount of net liabilities constituted an actual loss or cost. While it is possible that plaintiff may have paid off some of the liabilities, it is impossible to discern what portion was actually paid out when the entire amount of net liabilities is included as a cost. *Anchor Sav. Bank v. United States*, 59 Fed.Cl. 126, 161, 2003 WL 22415878, at *41 (Fed.Cl. Sept.29, 2003); see also *Glendale*, 54 Fed.Cl. at 13. As the Federal Circuit made clear in *LaSalle Talman*, "the treatment of assumed 'goodwill' liabilities as a cost of performance was generally resolved in *Glendale* .... Although the assumed liabilities are indeed an accounting cost ... they are not a usable measure of either cost to the thrift or benefit to the government ...." *LaSalle Talman*, 317 F.3d at 1376. The court simply cannot hold that the entire amount of net liabilities assumed constituted a cost where *LaSalle Talman* holds that "assumed liabilities ... are not a usable measure of ... cost to the thrift ...." *Id.*

Plaintiff relies on *Franklin Federal* as authority for permitting a thrift to demonstrate at trial that the assumption of liabilities led to actual losses.[23] As plaintiff correctly recognizes, the *Franklin Federal* court did grant the plaintiffs an opportunity to "establish that their assumption of ... excess liabilities ... led to concrete, measurable losses when the enactment of FIRREA breached the contract." *Franklin Fed.*, 55 Fed.Cl. at 120; see also *id.* at 121 ("[The plaintiffs] must do more than merely claim that the liabilities they paid off as a result of FIRREA 'required real expenditures.' At trial they must demonstrate when, to whom, and in what amounts those expenditures were made ...." (citations omitted)). In addition to *Franklin Federal*, the court's research revealed that *Citizens* likewise allowed a reliance claim based on net liabilities assumed to

proceed to trial. *Citizens* relied on *Franklin Federal* to hold that "if [the plaintiff] can establish that it incurred an actual economic cost when it assumed ... net liabilities ... and that the cost was not completely offset by the benefit it received from acquiring [the thrift], [the plaintiff] may be entitled to reliance damages." *Citizens*, 57 Fed.Cl. at 70.

Once again, as has become the norm in *Winstar*-related cases, other decisions of this court have rejected reliance damages based on net liabilities assumed. For instance, the *Fifth Third* court stated that "neither *Glendale* nor *Cal. Fed.* stands for the proposition that the assumption of net liabilities constitutes an appropriate measure of reliance damages." *Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. 223, 245 (2003). Moreover, the *Suess* court also noted that "the body of plaintiffs' belated reliance claim—based on plaintiffs' calculation of the value of the assumption of liabilities ... is no different than the basis of the restitution claim and is therefore equally flawed." *Suess*, 52 Fed.Cl. at 231–32 n. 11.

"The orders and opinions of a judge of coordinate jurisdiction constitute persuasive but not binding authority." *RSH Constructors, Inc. v. United States*, 20 Cl.Ct. 1, 6 n. 10 (1990) (quoting *Greenberg v. United States*, 1 Cl.Ct. 406, 407 (1983)). Given the persuasive value of *Franklin Federal* and *Citizens*, as opposed to the precedential value of *LaSalle Talman*, the court naturally will follow the reasoning in *LaSalle Talman*. As was discussed above, *LaSalle Talman* analogized a restitution cost of performance claim to a form of reliance damages. *LaSalle Talman*, 317 F.3d at 1376. If a restitution cost of performance claim premised on net liabilities assumed is precluded, and that claim "can be viewed as a form of reliance damages," it follows that a reliance claim based on net liabilities assumed is likewise barred. *S. Nat'l Corp. v. United States*, 57 Fed.Cl. 294, 300 (2003). In addition, it is noteworthy that *Franklin Federal* preceded *LaSalle Talman*. *Id.* Further, although *Citizens* was decided after *LaSalle Talman*, it neither referenced

---

**23.** Plaintiff's Reply Brief In Support Of Its Cross–Motion For Partial Summary Judgment at 2–3.

nor cited that case in its analysis of the plaintiff's reliance claim. *Id.*

In light of *LaSalle Talman,* and because plaintiff has included the full amount of net liabilities assumed in its cost of performance calculation, defendant is entitled to summary judgment on plaintiff's entire restitution and reliance cost of performance claims.[24]

### III. Lost Value/Cost of Replacement

Plaintiff sets forth three "lost value" models purporting to quantify the damages it sustained as a result of losing its supervisory capital. Plaintiff asserts that it was harmed because it was unable to sell the supervisory capital to its ultimate acquirer or offer it to other potential acquirers. Plaintiff also contends that it is entitled to the costs associated with a $250 million capital infusion from Ford. Lastly, plaintiff maintains, in the alternative, that it is entitled to recover the costs that would have been required to replace the supervisory capital over time, *i.e.*, the cost of cover. The court addresses plaintiff's arguments in reverse order.

### A. *Hypothetical Cost of Replacement— Supervisory Capital*

■ Plaintiff asserts that it is entitled to recover the hypothetical costs of replacing the supervisory capital lost as a result of the enactment of FIRREA. Plaintiff avers that the total cost of replacement equals $331.5 million. Defendant maintains that this court and the Federal Circuit have consistently rejected cost of replacement claims based on hypothetical preferred stock models. Defendant avers that plaintiff can only recover the costs that it actually incurred in replacing its supervisory capital. Defendant also contends that the proper measure of cost of replacement damages is transaction or floatation costs. Further, defendant asserts that

hypothetical preferred stock models are barred as a matter of law.[25]

Plaintiff's alternative cost of replacement model is inconsistent with the manner in which plaintiff allegedly replaced its supervisory capital, through a $250 million capital infusion from Ford.[26] As was explained in *LaSalle Talman,* where the court is confronted with a choice between relying on a hypothetical cost of replacement model or the thrifts' "actual experience" in replacing supervisory capital, the court should rely on the latter. *LaSalle Talman,* 317 F.3d at 1375; see also *Citizens,* 57 Fed.Cl. at 71 (rejecting "a hypothetical cost of replacement model, when, in fact, the thrift pursued another strategy"). Defendant is, therefore, entitled to summary judgment on plaintiff's alternative hypothetical cost of replacement model; however, pursuant to the dictates of *LaSalle Talman,* the court turns to examine the possible costs associated with Ford's $250 million capital infusion.

### B. *Ford's Capital Infusion*

■ Plaintiff asserts that it is entitled to the costs associated with Ford's $250 million capital infusion. Plaintiff maintains that it sustained costs because it "was expected to earn a return on that capital contribution." [27] Plaintiff also contends that there was an opportunity cost to both the bank and the holding company. According to plaintiff, Professor James calculated these damages by "analyzing the Holding Company's prior capital raising activity and other comparable market transactions." [28] Further, plaintiff relies heavily on the Federal Circuit's opinion in *LaSalle Talman* and this court's opinion in *Home Savings.*

Defendant, on the other hand, reiterates many of the same arguments raised in opposition to plaintiff's hypothetical preferred stock cost of replacement model. Defendant

---

24. The court, therefore, does not find it necessary to address defendant's motion for summary judgment on reasonable certainty, or the parties' cross-motions for summary judgment on causation and foreseeability.

25. Tr. at 36.

26. Although the cause of Ford's capital infusion is a factual issue which is disputed by the parties, the court will assume for purposes of this opinion that the infusion was caused by FIRREA.

27. Pl.'s Brief at 23 (quoting Plaintiff's Appendix 89).

28. *Id.* at 21.

asserts that plaintiff's damages model may not be based on a hypothetical construct. Defendant avers that the cost of raising capital is limited to transaction or floatation costs. Defendant supports its argument that replacement cost should be limited to transaction or floatation costs through what has been termed a "net present value zero" theory. Further, defendant maintains that plaintiff has not demonstrated how the fact that it was expected to earn a return on the capital infusion equates to damages. Defendant contends that plaintiff's "opportunity cost" argument is inconsistent with its argument that Ford would not have infused the capital into the bank absent the breach. Defendant also asserts that it did not require Ford to forego any opportunities as Ford could simply have raised additional capital to fund the infusion. Lastly, defendant avers that plaintiff was not in any way harmed by the infusion.

Given the parties' arguments as to the appropriate measure of the cost of capital, a summation of the pertinent case law addressing the issue, and its impact on the parties' arguments, is warranted. Defendant's assertion that the only costs plaintiff would have incurred were transaction or floatation costs is not accurate. *Home Sav. of America, FSB v. United States*, 57 Fed.Cl. 694, 707–09 (2003); *S. Cal.*, 57 Fed.Cl. at 624–25. Indeed, transaction or floatation costs are one recognized measure of the cost of capital. *Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1350 (Fed.Cir.2001) (explaining that there was "no clear error in the court's factual finding that the floatation costs provided an appropriate measure of Cal Fed's damages incurred in replacing the supervisory goodwill with tangible capital").

Defendant was asked at oral argument whether it was still asserting after *LaSalle Talman* that transaction or floatation costs were the sole measure of costs associated with capital raising. Defendant answered this question by stating that the holdings in *Bank United* and *Cal. Fed.*, which limited capital raising costs to transaction and floatation costs, were affirmed by the Federal Circuit.[29] Defendant's answer, however, did not in any

way account for *LaSalle Talman*. While defendant implies that a similar result to that in *Bank United* and *Cal. Fed.* would be forthcoming if the court limited the cost of raising capital to transaction or floatation costs, this does not somehow equate to the proposition that transaction or floatation costs are the only measure of cost of replacement.

The Federal Circuit in *LaSalle Talman* held that "capital is not 'costless' to either the investor or the recipient," *LaSalle Talman*, 317 F.3d at 1374, and that "[a]ll capital raised by a corporation has a cost . . . ." *Id.* at 1375. The Federal Circuit also held that "the cost of capital is the required rate of return on various types of financing." *LaSalle Talman*, 317 F.3d at 1374–75 (quoting JAMES VAN HORNE & JOHN M. WACHOWICZ, JR., FUNDAMENTALS OF FINANCIAL MANAGEMENT 387 (10th ed.1998)). The required rate of return must, of course, be offset by any benefits the plaintiff received from the replacement of supervisory capital with cash. *Id.* at 1375. *LaSalle Talman*, therefore, single-handedly forecloses defendant's argument that the cost of capital is limited to transaction or floatation costs. *Home Sav.*, 57 Fed.Cl. at 707–09; *Anchor*, 59 Fed.Cl. at 149–50, 2003 WL 22415878, at *27–28.

In sum, the Federal Circuit has delineated the costs associated with capital into two categories. A plaintiff would certainly be permitted to recover transaction or floatation costs incurred in raising capital. *Cal. Fed.*, 245 F.3d at 1350. A plaintiff would also be permitted to recover an amount equivalent to the "required rate of return" minus any accrued benefits. *LaSalle Talman*, 317 F.3d at 1374–75. The Federal Circuit has not recognized any additional costs of raising capital and the court declines to do so here. The issue, therefore, boils down to whether Professor James' preferred stock damages model is a proper vehicle by which to quantify these costs.

The entire category of hypothetical preferred stock models has been viewed with skepticism by this court and has not received favorable treatment. *Anchor*, 59 Fed.Cl. at

**29.** Tr. at 42.

158, 2003 WL 22415878, at \*37 (and cases cited therein); *Citizens,* 57 Fed.Cl. at 71–72; *Franklin Fed.,* 55 Fed.Cl. at 135–39; *Columbia First Bank, FSB v. United States,* 54 Fed.Cl. 693, 699 (2002); *Bank United of Texas v. United States,* 50 Fed.Cl. 645, 665 (2001), *aff'd in part, rev'd in part,* 80 Fed. Appx. 663 (Fed.Cir.2003) (unpublished opinion); but see *Glass v. United States,* 47 Fed.Cl. 316 (2000), *rev'd in part,* 258 F.3d 1349 (2001). To make matters worse for plaintiff, this court and the Federal Circuit have rejected substantially similar hypothetical models offered by Professor James. *LaSalle Talman,* 317 F.3d at 1375; *Fifth Third,* 55 Fed.Cl. at 242.

Although Ford's $250 million capital infusion *actually* occurred, the costs which plaintiff's hypothetical preferred stock model purports to quantify lack that same distinguishing characteristic. In *LaSalle Talman,* the plaintiff "[o]ver the period of 1993 to 1998 ... made dividend payments to [its parent corporation] totaling $417.8 million." *LaSalle Talman,* 317 F.3d at 1369. While the Federal Circuit indicated that "capital is not 'costless' to either the investor or the recipient," *id.* at 1374, it was not willing to go to the extent of relying on a hypothetical model to attribute a cost to that capital. *Id.* at 1375. Specifically, the Federal Circuit rejected a calculation that "[did] not reflect the [plaintiff's] actual experience that the dividends were paid out of earnings, and that the earnings appear to have exceeded the hurdle rate as well as [the plaintiff's] projected earnings but for the breach." *Id.*

The court is cognizant of the fact that plaintiff's model is offered as a proxy for the costs it alleges were incurred. The fatal flaw in plaintiff's argument and its implementing model, however, is that they fail to "reflect the [plaintiff's] actual experience ...." *Id.* Professor James' model in this case, therefore, presents the same concerns as his model that was rejected by the Federal Circuit in *LaSalle Talman.* The court simply cannot ascertain the manner in which the money was actually invested, the actual earnings on that investment, or whether the earnings from that investment exceeded the rate of return that was allegedly required. See *id.* Plaintiff's "actual experience" involved a capital infusion that replaced the supervisory capital that had been eliminated. Plaintiff was in possession of $250 million in cash as opposed to an approximate equivalent in supervisory capital, and could continue its operations. Plaintiff was not constrained from investing that money and earning a return on it. Plaintiff also benefitted from the infusion as it was not required to, nor did it, ever make any dividend payments.[30] Plaintiff, in essence, asks this court to blind itself to this "actual experience" and focus on its preferred stock model. While "[a]ll capital raised by a corporation has a cost," *LaSalle Talman,* 317 F.3d at 1375, such costs cannot be ascertained in this manner.[31] Defendant is, therefore, entitled to summary judgment on this issue.

### C. *Lost Value On Sale/Diminished Sale Price*

Plaintiff asserts that it incurred losses when it sold the bank to First Madison in 1994. Plaintiff relies on Mr. Walker's testimony that he "could have structured the deal to preserve the value of the supervisory capital had it been available for sale."[32] Plaintiff also maintains that Mr. Walker indicated that all of FNB's potential acquirers had plans to expand and, in turn, had a use for the supervisory capital. Further, plaintiff relies on another hypothetical preferred stock model from Professor James. Relying on *Home Savings,* plaintiff also contends that Generally Accepted Accounting Principles (GAAP) do not govern plaintiff's contractual rights. Plaintiff avers that defendant's argument that it was compensated for the supervisory capital does not account for the fact

---

**30.** Def.'s App. 441; Tr. at 81–82.

**31.** Plaintiff argues that the *Home Savings* court endorsed a model that contained a "proxy for what existing shareholders would demand ...." *Home Sav.,* 57 Fed.Cl. at 715. The *Home Savings* court noted, however, that the plaintiff was not relying on the hypothetical issuance of preferred stock as in *Franklin Federal,* but on actual costs in raising capital. *Id.* at 728. *Home Savings,* therefore, does not assist plaintiff.

**32.** Pl.'s Brief at 30.

that plaintiff had to repay $250 million to Ford from the sale proceeds.

Defendant again maintains that Professor James' model is barred as it is based on the hypothetical issuance of preferred stock. Defendant also advances several arguments that apply to both Professor James' and Mr. Walker's models. Defendant asserts that supervisory capital is not transferrable. Defendant also asserts that, pursuant to GAAP, all goodwill had to have been written-off at the time of sale. Defendant avers that plaintiff's expert indicated that First Madison had no use for supervisory capital. Further, defendant contends that plaintiff was not harmed because it received compensation for the $250 million capital infusion when the thrifts were sold.

Upon an initial glance, Professor James' "lost value on sale" model deflects attention away from the manner in which he calculates the value of supervisory capital and focuses attention on what the prospective acquirers would have paid. Such a distraction is short-lived, however, and one quickly refocuses on the crux of the issue. Not much has changed from the other models offered by Professor James in this case; this model calculates the value of supervisory capital through a hypothetical preferred stock model. Although plaintiff's "lost value" models carry with them different titles, the manner in which they calculate the value remains the same. Accordingly, the court approaches Professor James' "lost value on sale" model with caution.

Plaintiff has also offered Mr. Walker's model on the issue of "lost value" upon the bank's sale. Mr. Walker relies on a leverage model, and a sensitivity analysis, which purports "to ensure that the value attributed to goodwill by the acquirer exceeded its bare minimum value." [33] Initially, the parties dispute whether supervisory capital is transferrable. Mr. Walker stated in his deposition that he conducted his analysis under the assumption, which was provided by plaintiff's counsel, that supervisory capital was transferrable.[34] Mr. Walker also indicated that he

had no independent knowledge of whether supervisory capital could be transferred.[35] With this in mind, the court notes that plaintiff's counsel's assumption runs contrary to the conclusion reached by the *Glass* court. *Glass*, 47 Fed.Cl. at 327–28 (accepting an expert's conclusion that goodwill was not transferrable).

Assuming for the moment that supervisory capital is transferrable, Professor James' and Mr. Walker's models do not adequately answer the question of why an acquirer would have expended actual cash to acquire the supervisory capital. Cash provides benefits which could not be reaped from supervisory capital. For example, the cash could have been invested, it could have earned interest, and it would have provided greater borrowing and leveraging capacity, which according to Mr. Walker was an important selling point to potential acquirers. *Suess*, 52 Fed.Cl. at 230 (noting that "real capital ... unlike goodwill, could be used to invest in real interest earning assets and would not be a drag on earnings like goodwill").

Further, and perhaps most importantly, cash does not amortize. The amount of the supervisory capital would have decreased to $136.5 million by the conclusion of the year 2000, and would have been completely off the books by the year 2011. In contrast, if invested reasonably, the full amount of cash and its earnings would still be available in 2011. Professor James' and Mr. Walker's models, therefore, rest on a second questionable assumption—that a potential acquirer, given the advantages of cash and the disadvantages of supervisory capital, would nevertheless have accepted Mr. Walker's structuring and purchased the supervisory capital. Given the benefit of the insight of previous *Winstar*-related cases, the court concludes that the proposition that a prospective acquirer may have paid plaintiff $137.1 million for $274 million in supervisory capital is speculative and, "at best, implausible." *Suess*, 52 Fed.Cl. at 230 (rejecting a claim that Bank of America would have expended $110 million to purchase $285 million in goodwill).

33. Def.'s App. at 167.

34. *Id.* at 471.

35. *Id.*

*Conclusion*

For the above-stated reasons, defendant's motion for summary judgment on damages is hereby GRANTED. Plaintiff's cross-motion for partial summary judgment concerning foreseeability and causation is hereby MOOT. The Clerk of the Court is directed to enter judgment in accordance with this opinion. No costs.

IT IS SO ORDERED.